ATCHISON, T. & S. F. RY. CO. v. WHITE.

No. 2384–BH.

District Court, S. D. California, Central Division.

April 22, 1943.

Jonathan C. Gibson, M. W. Reed, L. W. Butterfield, and William F. Brooks, all of Los Angeles, Cal., for plaintiff.

Arthur H. Glanz and Theodore W. Russell, both of Los Angeles, Cal., for defendant.

HARRISON, District Judge.

This action was instituted by plaintiff against defendant to recover undercharges on 118 separate carload shipments made by defendant during the period of August, 1939, to February, 1941, which charges plaintiff contends must be collected in accordance with the lawfully published tariffs then in effect.

Like in the case of Atchison, Topeka and Santa Fe Railway Company v. Judson Freight Forwarding Company, etc., D.C., 49 F.Supp. 789, this day decided by me, the question for determination is whether the shipper should have been billed for two forty-foot cars on each shipment instead of one fifty-foot car. Originally, the shipper was billed on the theory that in each instance a fifty-foot car had been ordered and that two forty-foot cars had been furnished at carrier's convenience under what is commonly known as the two for one rule. Thereafter, the carrier determined, after an investigation by the Interstate Commerce Commission, that the lawful tariff on each shipment had not been collected, hence this suit.

The parties have stipulated that the higher freight charges claimed by plaintiff in each

cause of action are lawfully applicable in the event the court shall find that two smaller cars were not lawfully substituted for a larger car ordered by the defendant in compliance with the tariff rules and regulations governing the substitution of two smaller cars for a larger one.

The facts disclose that all shipments went forward under Item 503 of Trans-Continental Freight Bureau East Bound Tariff No. 3, Series I.C.C. No. 1431, which in part provides:

"Except where specifically provided to the contrary in individual items of this tariff, carrier will furnish car of dimensions or weight carrying capacity ordered by shipper, but if carrier for its convenience furnishes car of different dimensions or weight carrying capacity, the following rules will govern. * * *

"When car of smaller dimensions or less weight carrying capacity is furnished, actual weight applies provided it is loaded to its full visible capacity or as heavily as loading conditions will permit; the balance of the shipment will be taken in another car at actual weight and carload rate, and the entire shipment will be subject to carload minimum weight applicable to the car of dimensions or weight carrying capacity ordered (Subject to Notes 1 and 2). * * *"

The facts surrounding the circumstances under which the forty foot cars were furnished are best reflected by the testimony of the defendant, who in substance testified as follows:

He had been engaged in the freight forwarding business for about twenty-five years and had wide experience in the freight forwarding business, was and is generally familiar with the published tariffs, rates, rules and regulations. In April, 1937, he started his own freight forwarding business in Los Angeles at a location adjacent to the Wingfoot Station of carrier. He specialized in eastbound freight consisting principally of heavy machinery and automobile parts. Shortly after commencing business, in April or May, 1937, he talked to the agent of the carrier and made inquiry into the method of the operations of his competitors. The agent not being informed made inquiry and advised the shipper that the National Carloading Corporation was shipping under the so-called two for one rule. The shipper then asked if it "would be o.k. or satisfactory, under the tariff, if we could use the same loading rules as the other companies". He stated he was familiar with Item 503 and that the rules and regulations on loading equipment had to be followed and "that's why I wasn't going to do anything, or take any advantage of any misinterpretation of the tariff. Before we started loading the forty foot cars I wanted to be sure the tariff authority was there". The agent of the carrier assured the shipper he could have two forty-foot cars in place of the fifty-foot car ordered and that the same would not be in violation of the published tariffs.

Thereafter, the shipper would usually order cars by telephone. When ordering cars, he would not specify the equipment, but simply advise the carrier "we want to load today". Thereupon two forty-foot cars would be furnished. The shipper would prepare his own bill of lading and endorse thereon "1-50 foot car ordered; 2 smaller cars furnished by R.R."

In February, 1941, the carrier discontinued the practice of furnishing two forty-foot cars in lieu of one fifty-foot car. The shipper vigorously protested the change and contended the tariff provisions had not been violated.

From the foregoing testimony of the shipper the following facts appear: That the shipper was familiar with the provisions of Item 503; that the shipper at no time ordered a fifty-foot car; that the shipper was furnished two forty-foot cars but was billed on the basis that one fifty-foot car had been ordered, in accordance with an agreement between the parties; that the shipper knew when he advised the carrier he was ready to load that he would be furnished two forty-foot cars; that the shipper acted in good faith and relied upon the representations of the agent of the carrier that the furnishing of two forty-foot cars in lieu of one fifty-foot car was not a violation of the published tariff provisions.

Shipper contended and offered evidence to the effect that carrier's convenience was subserved by the substitution of the smaller cars for the larger car. The evidence in this respect is conflicting. Suffice it to say that in the substitution of the smaller cars, no consideration was given to the carrier's convenience. Furthermore, it is not possible to visualize the exact conditions existing at the time of each shipment at this late date. The evidence does disclose that at all times the carrier had fifty foot cars available and readily accessible.

It is further contended by the shipper that the substitution afforded him no advantage. The shipper wanted the smaller cars and was very vociferous when their use was denied him. These facts, coupled with the knowledge that he thereby had considerable additional floor space for loading, convinced me that the shipper gained an advantage and preferential treatment by the carrier.

 It will be noted under Item 503, that the shipper is entitled to the equipment ordered and the carrier must comply with the order of the shipper and can only substitute other equipment for its own convenience. Under no circumstances would "carriers' convenience" come into play until an order had been placed for specified equipment. See Western Trunk Line Rate Increases, 43 I.C.C. 481-493; Noble v. Baltimore & Ohio Railroad Company, 22 I.C.C. 432. If no order for specified equipment had been placed then the shipper would be liable for equipment furnished by carrier and used by shipper.

Under the testimony of the shipper it is apparent that no order was placed for specified type of equipment and as a result there would be no legal grounds upon which the shipper would be entitled to the benefits of said Item 503.

 Shipper contends that the smaller cars were furnished for carrier's convenience. Shipper offered evidence to the effect that carrier's convenience not only included operating convenience, but it was a convenience to the carrier in meeting truck competition. This rule has no application in meeting competition. United States v. Chicago Heights Trucking Co., 310 U.S. 344, 60 S.Ct. 931, 84 L.Ed. 1243. While the term "carriers' convenience" is one of long use, our reviewing courts never have had occasion to define said term. To me, the term signifies, as used in said Item 503, that before the carrier is justified in making a substitution, the car ordered must not be readily available and operatively advantageous for the carrier to furnish.

 The testimony of the shipper demonstrates that no "carriers' convenience" was considered but that two forty-foot cars were furnished under the guise that a fifty-foot car had been ordered. The shipper knew that a fifty-foot car had not been ordered. He knew that the smaller cars were being furnished pursuant to an arrangement with the agent of the carrier back in 1937. He knew when he prepared the bill of lading and endorsed thereon "1-50 ft. car ordered, 2 smaller cars furnished by R.R." that it was not a true statement. Assuming he believed he was not violating any tariff provision and he was misled by the agent of the carrier, still he is chargeable with the knowledge and is liable for the legal rates.

In McFadden v. Alabama Great Southern R. Co., 3 Cir., 241 F. 562, 565, the court said: "In approaching this question we lay aside all considerations of conduct, intention, mistake and misunderstanding respecting the rate paid, for the law is very well settled that the Act to Regulate Commerce demands not only that the carrier shall charge but that the shipper shall pay the legal rate. The contract between carrier and shipper is no longer a contract as to rates; it is merely a contract that the carrier will render transportation service when the shipper pays the legal rate. When the transportation is interstate, the interstate rate is the legal rate, and that rate must be demanded and paid, for both the carrier and shipper are charged with notice of it; and if a lesser rate is charged and paid, intentionally or innocently, recovery must be had against the shipper for the difference, in order that the policy of the law against unjust discrimination may be carried out."

Keogh v. Chicago & Northwestern Railway Company, 260 U.S. 156, 43 S.Ct. 47, 49, 67 L.Ed. 183, states as follows: "* * * The legal rights of shipper as against carrier in respect to a rate are measured by the published tariff. Unless and until suspended or set aside, this rate is made, for all purposes, the legal rate, as between carrier and shipper. The rights as defined by the tariff cannot be varied or enlarged by either contract or tort of the carrier. Texas & Pacific R. Co. v. Mugg, 202 U.S. 242, 26 S.Ct. 628, 50 L.Ed. 1011; Louisville & Nashville R. Co. v. Maxwell, 237 U.S. 94, 35 S.Ct. 494, 59 L.Ed. 853, L.R.A. 1915E, 665; Atchison, Topeka & Santa Fe Ry. Co. v. Robinson, 233 U.S. 173, 34 S.Ct. 556, 58 L.Ed. 901; Dayton Coal Iron Co. v. Cincinnati, New Orleans & Texas Pacific Ry. Co., 239 U.S. 446, 36 S.Ct. 137, 60 L. Ed. 375; Erie R. Co. v. Stone, 244 U.S. 332, 37 S.Ct. 633, 61 L.Ed. 1173. And they are not affected by the tort of a third party. Compare Pittsburgh, Cincinnati, Chicago & St. Louis Ry. Co. v. Fink, 250 U.S. 577, 40 S.Ct. 27, 63 L.Ed. 1151. This stringent

rule prevails, because otherwise the paramount purpose of Congress—prevention of unjust discrimination—might be defeated."

In the case of Pittsburgh, C., C. & St. L. R. Co. v. Fink, 250 U.S. 577, 40 S.Ct. 27, 28, 63 L.Ed. 1151, it appears that on a shipment, the waybill specified the charges in the sum of $15. The legal rate should have been $30. The state court denied the carrier the right to recover on the undercharge, and the United States Supreme Court in reversing the state court said among other things: "It was, therefore, unlawful for the carrier upon delivering the merchandise consigned to Fink to depart from the tariff rates filed. The statute made it unlawful for the carrier to receive compensation less than the sum fixed by the tariff rates duly filed. Fink, as well as the carrier, must be presumed to know the law, and to have understood that the rate charged could lawfully be only the one fixed by the tariff. When the carrier turned over the goods to Fink upon a mistaken understanding of the rate legally chargeable, both it and the consignee undoubtedly acted upon the belief that the charges collected were those authorized by law. Under such circumstances consistently with the provisions of the Interstate Commerce Act the consignee was only entitled to the merchandise when he paid for the transportation thereof the amount specified as required by the statute. For the legal charges the carrier had a lien upon the goods, and this lien could be discharged and the consignee become entitled to the goods only upon tender or payment of this rate. Texas & Pacific Railway Co. v. Mugg, 202 U.S. 242, 26 S.Ct. 628, 50 L.Ed. 1011. The transaction, in the light of the act, amounted to an assumption on the part of Fink to pay the only legal rate the carrier had the right to charge or the consignee the right to pay. This may be in the present as well as some other cases a hardship upon the consignee due to the fact that he paid all that was demanded when the freight was delivered; but instances of individual hardship cannot change the policy which Congress has embodied in the statute in order to secure uniformity in charges for transportation. Louisville & Nashville Railroad Co. v. Maxwell, 237 U.S. 94, 35 S.Ct. 494, 59 L.Ed. 853, L.R.A. 1915E, 665. In that case the rule herein stated was enforced as against a passenger who had purchased a ticket from an agent of the company at less than the published rate. The opinion in that case reviewed the previous decisions of this court, from which we find no occasion to depart."

In the recent case of Union Pacific Railroad Company v. United States, 313 U.S. 450-462, 61 S.Ct. 1064, 1071, 85 L.Ed. 1453, the court through Mr. Justice Reed, said: "Violation of the commerce acts through receipt of advantages is to be tested by actual results not by intention. * * * In fact favoritism which destroys equality between shippers, however brought about, is not tolerated."

Mr. Justice Brandeis in Louisville & Nashville Railroad Company v. Central Iron & Coal Company, 265 U.S. 59-65, 44 S.Ct. 441, 442, 68 L.Ed. 900, said: "* * * The amount of the freight charges legally payable was determined by applying this tariff rate to the actual weight. Thus they were fixed by law. No contract of the carrier could reduce the amount legally payable, or release from liability a shipper who had assumed an obligation to pay the charges. Nor could any act or omission of the carrier (except the running of the statute of limitations) estop or preclude it from enforcing payment of the full amount by a person liable therefor."

■ Tariff provisions have the force and effect of a statute and cannot be deviated from under any circumstances. Penn. Rail-Road Company v. International Coal Mining Co., 230 U.S. 184, 33 S.Ct. 893, 57 L.Ed. 1446; Louisville & Nashville Railroad Company v. Maxwell, 237 U.S. 94, 35 S.Ct. 494, 59 L.Ed. 853, L.R.A. 1915E, 665; Baldwin v. Scott County Milling Co., 307 U.S. 478, 59 S.Ct. 943, 83 L.Ed. 1409; 13 C.J.S., Carriers, § 393, pp. 873-876; Button v. Atchison, Topeka & Santa Fe Railway Co., 8 Cir., 1 F.2d 709.

It is thus apparent that the defendant gained an advantage contrary to the laws governing the regulation of interstate carriers of commerce, and in particular 49 U.S.C.A. §§ 2, 3(1) and 6(7). This advantage he cannot retain, but must pay the legal rate on the shipments involved notwithstanding it may appear as a distinct hardship on the shipper.

I therefore find for the plaintiff on two grounds:

1. That Item 503 has no application to the shipments involved for the reason no specified equipment was ordered by the defendant.

2. That the two smaller cars were furnished pursuant to an agreement between

the parties, notwithstanding the fact that the plaintiff, through its agents may have lulled shipper into believing that he would have to pay only on the larger car.

Plaintiff is directed to submit expeditiously proposed findings of fact, conclusions of law and judgment for signature.