**PACIFIC PORTLAND CEMENT CO. v. WESTERN PAC. R. CO.**

Nos. 12327, 12328.

United States Court of Appeals Ninth Circuit.

Aug. 25, 1950.

Rehearing Denied Oct. 9, 1950.

Writ of Certiorari Denied Dec. 11, 1950.

See 71 S.Ct. 282.

Marshall P. Madison, Eugene Prince, Eugene D. Bennett, Francis R. Kirkham, James Michael, all of San Francisco, Cal. (Pillsbury, Madison & Sutro, San Francisco, Cal., of counsel), for appellant.

C. W. Dooling and E. L. Van Dellen, San Francisco, Cal., for appellee.

Before MATHEWS, ORR and LINDLEY,* Circuit Judges.

ORR, Circuit Judge.

Appellee received judgments in the district court for demurrage charges alleged to have accrued on cars furnished appellant to make shipments of gypsum products. From 1924 through the two-year period covered by this suit, ending in December 1946, appellant operated a gypsum plant situate approximately five miles south of Gerlach, Nevada, a station on appellee's main line between San Francisco, California, and Salt Lake City, Utah. The plant was connected with appellee's tracks at Gerlach by a private railroad owned by appellant. Because the private tracks of appellant would not sustain a regular freight locomotive, a switch engine owned by appellant was used to haul cars between its plant and Gerlach.

From 1924 to 1926 appellant's practice was to take onto its tracks only the number of empty cars which it was in a position to return loaded within the next six to eighteen hours. Orders for the cars were given to appellee's Gerlach station agent before appellant removed the cars from the Gerlach yard. In 1926 the Gerlach agent requested appellant's plant superintendent to take cars from the Gerlach yard in advance of the time they were needed for loading in order to relieve congestion on the tracks in appellee's yard. The agent explained to the plant superintendent that "the cars at the plant would be the same as in the Gerlach yard, and when we [appellant] took them to load, it would be the same as taking them from Gerlach." Pursuant to this request it was arranged that appellant's engine should remove empty cars regularly from the yard and store them on appellant's tracks until needed for loading at appellant's plant. This arrangement was carried out during the ensuing twenty years. Regular car order forms were filled out and delivered to the Gerlach agent listing the cars as having been "ordered" at the time they were removed from storage on appellant's tracks and spotted for loading at the plant. All cars which appellant removed to its tracks were returned loaded. Demurrage was charged to appellant only when such charges were warranted by the time elapsing between the moment each car was spotted for loading, as shown on the car order, and the moment the car was returned loaded to appellee's tracks.

This arrangement was set up primarily for the benefit of appellee. It relieved congestion which would otherwise have been

* Circuit Judge, Seventh Circuit, sitting by special designation.

placed on the limited trackage available at Gerlach. The alternative to the use by appellee of appellant's tracks for storage would have been the construction of additional trackage by appellee. A difficult situation confronted appellee in the furnishing of the cars required by appellant to fill its needs of some 15 to 20 cars a day. The empty car supply was 400 miles from Gerlach. A storage reserve was necessary. This could not be accomplished without adequate tracks. Appellee did not have them. Its tracks at Gerlach were congested much of the time as a result of the practice of appellee of servicing trains there. It was a meeting place for trains and trains were held at that point in order to permit crews to eat. The congestion was aggravated by the greatly increased traffic during the war years.

In 1946 an agent of the Pacific Car Demurrage Bureau, originated by Pacific Coast railroads for the purpose of administering demurrage charges, investigated the situation at Gerlach and recommended that appellant be charged for demurrage from the time cars were taken to its tracks rather than from the time they were spotted for loading. Following this recommendation a series of letters was written to the manager of the Bureau by agents of appellee. These, together with oral testimony, conclusively establish the agreement and arrangement under which the parties operated for so many years. Excerpts from the letters appear in Note 1.

On June 12, 1946, appellee for the first time notified appellant that demurrage was to be computed from the time empty cars were removed from the Gerlach yard onto appellant's tracks. On October 26, 1946, the first of these two actions was commenced for unpaid demurrage alleged to have accrued within the two-year period of limitations.

While not conceding the agreement as to the disposition and use of cars to be as alleged by appellant, appellee contends that in any event such an agreement would be immaterial for the reason, first that appellee, as a common carrier by railroad in interstate commerce, was required by law to collect the full amount of demurrage due from appellant under appellee's tariffs on file with

1. April 11, 1946, from appellee's Superintendent of Eastern Division: "Our investigation of this matter indicates that over a long period of time, and particularly since business became so heavy, that the P.P.C. Company stores empties in their yard at Empire [name of appellant's plant] so as to relieve congestion in our yard at Gerlach. They will, of course, if they are forced to pay for time for storing these empties in their yard at Empire, require us to hold them at Gerlach and move them to Empire only if they can load them and this will only add to our yard congestion at Gerlach and might force us to provide more trackage.

"They are loading 15 to 20 cars per day and for the railroad's convenience it is necessary to keep a supply of at least 3, preferably 4 or 5 [days' supply of] empties, on hand at Gerlach for their use.

"I do not believe in reality that they are using over their free time in actually loading any equipment.

"I am giving copies of all correspondence to Mr. Quigley, our Superintendent of Transportation, and it would seem, inasmuch as we have gone along with the P.P.C. Company in the manner of present handling that it might be in order to give them a chance to change their methods of car handling rather than charge them with demurrage. * * *."

April 16, 1946, from appellee's Superintendent of Transportation: "Frankly, it is not the opinion of this office, that the Pacific Portland Cement Company are trying to evade any demurrage charges at Gerlach and it is to our interest that they move and store such cars as likely required, a good supply of needed equipment at the industry tracks and if this were not done there would be many times that we may be out of cars for their plant's loading."

May 15, 1946, from appellee's Superintendent of Transportation: "I respectfully refer you to our letter dated April 16 * * * in connection with our practice of storing freight car equipment on the tracks belonging to the Pacific Portland Cement Co. at Gerlach instead of utilizing our limited track space in our Gerlach railroad yard for this purpose.

"I would appreciate it if you would advise me what the status of this matter is at the present time * * *."

the Interstate Commerce Commission, irrespective of any agreements or understandings or of intended purpose or benefit. Second, that under appellee's tariff demurrage charges were applicable on all cars which were returned loaded by appellant from the time appellant took such cars onto its tracks, regardless of any other circumstances.

We agree that published tariffs are binding on both carrier and shipper and that the shipper's liability under such tariffs cannot be waived by any arrangement, understanding or course of conduct between the parties. 49 U.S.C.A. §§ 2, 3(1), 6(7); Lowden v. Simonds-Shields-Lonsdale Grain Co., 1939, 306 U.S. 516, 59 S.Ct. 612, 83 L. Ed. 953; Atchison, T. & S. F. Ry. v. Judson Freight Forwarding Co., D.C.S.D.Cal. 1943, 49 F.Supp. 789; Atchison T. & S. F. Ry. v. White, D.C.1943, 49 F.Supp. 797. It is no less true, however, that the tariffs themselves impose no liability for demurrage under the facts of the instant case.

The tariffs applicable here are found in "Car Demurrage Rules and Charges," published by the Tariff Bureau of the Association of American Railroads, of which appellee is a member. Item 500, Rule 1, Sec.

A prescribes what cars are subject to the demurrage rules. It reads as follows: "Cars of either railroad or private ownership, held for or by consignors or consignees for loading, unloading, forwarding directions or for any other purpose * * * are subject to these demurrage rules. * * *"

There is a wide disagreement among counsel as to the proper construction to be placed on the phrase "or for any other purpose" as it is used in the rule. We find it unnecessary for the purposes of this decision to construe the phrase because it is clear from other applicable rules that the time on which demurrage charges are based did not commence to run until appellant spotted the cars for loading.

Under Item 505, Rule 2, a shipper is allowed a certain amount of free time, usually 48 hours, to load a car before he begins to be charged demurrage on that car. The method of determining the moment at which this free time begins to run is set out in Item 510, Rule 3.[2] Under this rule demurrage time cannot begin to run until there is actual or constructive "placement" of the car on a designated interchange track or at

2. Demurrage Rules and Charges. Rule No. 3. Computing Time. Item No. 510.

Section A.—1. On cars for loading on other than public delivery tracks time will be computed from the first 7:00 a. m. after actual or constructive placement, and without notice of actual placement.

Section D.—Except as otherwise provided in Section B, Paragraph 1, of this Rule, on cars to be delivered on other-than-public-delivery tracks, time will be computed from the first 7:00 a. m. after actual or constructive placement on such tracks.

Time computed from actual placement on cars placed at exactly 7:00 a. m. will begin at the same 7:00 a. m.; actual placement to be determined by the precise time the engine cuts loose.

Note 1.—"Actual Placement" is made when a car is placed in an accessible position for loading or unloading or at a point previously designated by the consignor or consignee. If such placing is prevented from any cause attributable to consignor or consignee and car is placed on the private or other-than-public-delivery tracks serving the con-

signor or consignee, it shall be considered constructively placed without notice.

Section E.—1. Except as otherwise provided in Section B, Paragraph 1, of this rule, and in Paragraph 2 of this section, on cars to be delivered on interchange tracks of industrial plants performing the switching service for themselves or other parties, time will be computed from the first 7:00 a. m. after actual or constructive placement on such interchange tracks until return to the same or another interchange track. Time computed from actual placement on cars placed at exactly 7:00 a. m. will begin at the same 7:00 a. m.; actual placement to be determined by the precise time the engine cuts loose. * * *

Note.—Where two or more parties each with its own power take delivery from the same interchange track, or where this railroad company uses the interchange track for other cars, or where the interchange track is not adjacent to the plant and the industry uses this railroad's tracks to reach same, a notice of placement shall be sent or given to the consignee and time will be computed from the first 7:00 a. m. thereafter.

the loading point or at a point previously designated by the shipper. The question then posed is, when did such placement take place? With respect to empty cars being placed for loading the time of placement is determined by Rule 6, which reads in part as follows:

"Section A. Cars for loading will be considered placed when such cars are actually placed or held on orders of the consignor. In the latter case the agent must send or give the consignor written notice of all cars which he has been unable to place because of condition of the other-than-public-delivery track or because of other conditions attributable to the consignor. This will be considered constructive placement. (See Rule 3, Sections A, D and E * * *.)

"Section B. When empty cars placed on orders are not used in transportation service, demurrage will be charged from actual or constructive placement until released, with no free time allowance.

"Note. In the application of this section a demurrage day consists of a twenty-four-hour period computed from the hour of actual or constructive placement of the car. (See Section D.)

    *    *    *    *    *    *

"Section D. If an empty car is appropriated without being ordered, it shall be considered as having been ordered and actually placed at the time so appropriated. If not loaded outbound, such car is subject to Section B of this Rule."

It is not contended that the bringing of empty cars by appellant onto its track constituted placement within the meaning of Section A of Rule 6. Section A requires that the placement be "on orders of the consignor," and no such orders were given prior to the spotting of the cars for loading. Cf., U. S. Fidelity & Guaranty Co. v. Central of Georgia Ry., 1933, 226 Ala. 606, 147 So. 891, 87 A.L.R. 1028. Placement, and consequently the running of time for demurrage, must have taken place, therefore when the cars were "appropriated" within the meaning of Rule 6, Section D. The uncontradicted evidence establishes the appropriation to have taken place when the cars were removed from their storage positions onto appellant's tracks and spotted for loading at the plant.

Webster's New International Dictionary gives the following pertinent definitions of the verb "appropriate": "To take to one's self in exclusion of others; to claim or use as by an exclusive or pre-eminent right;" "to set apart for, or assign to, a particular purpose or use, in exclusion of all others." Appropriation of the cars could not take place until the cars were set apart for appellant's use to the exclusion of the railroad. When this took place depended upon the intentions of appellant in taking the cars onto its tracks and the understanding between the parties.

In considering the question of when appropriation took place, we are faced at the outset with the circumstance that if appellant knowingly appropriated the cars when it first took them onto its tracks, and if appellee willfully failed to charge demurrage computed from the time appropriation first took place, both parties were thereby guilty of crimes under 49 U.S.C.A. § 41(1). In the absence of substantial evidence to the contrary, we must presume that both parties conducted their businesses in compliance with the law. Cincinnati, New Orleans & Texas Pacific Ry. v. Rankin, 1916, 241 U.S. 319, 327, 36 S.Ct. 555, 60 L.Ed. 1022, L.R.A.1917A, 265; American Railway Express Co. v. Lindenburg, 1923, 260 U.S. 584, 588, 43 S.Ct. 206, 67 L.Ed. 414. Since it is undisputed that demurrage was charged only from the time the cars were spotted for loading, we must presume that the parties understood and intended that the cars not be considered appropriated, i. e., set aside for appellant's use, until that time.

The reasonable inference to be drawn from the uncontradicted evidence is that both parties regarded the cars stored on appellant's tracks as being held for the benefit of appellee and subject to appellee's control. The conversations between the station agents and the plant superintendent, the practice of appellee in not computing demurrage until the cars were spotted for loading, the letters written by appellee's officers after the question was raised by the demurrage bureau, unquestionably sustain

such a conclusion. The arrangement was certainly a reasonable one. The railroad apparently recognized its "obligation * * * to use diligence to provide, upon reasonable notice, cars for loading at the time desired." Davis v. Cornwell, 1924, 264 U.S. 560, 561, 44 S.Ct. 410, 68 L.Ed. 848. The long distance from the source of supply of empty cars made it necessary to build up a reservoir of several days supply in advance if this obligation was to be properly discharged, and to do this was impossible with existing facilities without using some of appellant's tracks for storage. It is said that the arrangement also benefited appellant in that it made frequent demands for additional cars and the creation of a reserve supply on appellant's tracks was the best method available to meet that demand. Such a benefit to appellant was incidental and consisted of the assurance of a regular car supply, a benefit which appellee was already bound by law to use every reasonable effort to afford.

We are unable to agree with the view that the intentions and understanding with respect to the time of appropriation are immaterial in view of Item 5(b) of the Demurrage Rules, which provides: "The disposition at point of detention determines the purpose for which a car is held and the rule applicable thereto, except where there is specific tariff provision to the contrary," and that under this rule the fact that appellant eventually returned the cars under load was in itself sufficient to establish that the cars were held for the purpose of loading from the time they first entered appellant's tracks, and therefore they must be deemed to have been "appropriated" at that time within the meaning of Rule 6, section D. We cannot construe Item 5(b), which appears in the introductory section at the very beginning of the Demurrage Rules, as modifying the natural meaning of the word "appropriated" in Rule 6, section D. Item 5(b) presupposes a "detention" and an uncertainty as to the purpose of the detention which might in some circumstances determine which rule was applicable. The question here is when such "detention" occurred, and the answer depends on when there was an appropriation under Rule 6D. The occurrence of an appropriation rests in turn upon the intentions and understanding of the parties, which in this case clearly establish the correctness and legality of the methods employed by appellee in making demurrage charges over a twenty-year period.

This conclusion is fortified by a consideration of the inequity of a contrary holding. Such a holding would result in appellant being held liable to appellee not for a service which appellee had rendered to appellant, but for a service which appellant had rendered to appellee. The validity of a tariff which would impose such liability would at least be doubtful. Cf., Indiana Harbor Belt R. R. v. Jacob Sterns & Sons, D.C. N.D.Ill., 1941, 37 F.Supp. 690, 692. Indeed, under the last sentence of Rule 6D if demurrage time were held automatically to have commenced when the cars entered appellant's tracks and subsequently appellant had returned an empty car to appellee at the latter's request, appellant would be liable for demurrage without benefit of the free time which is allowed on cars appropriated for loading. Such a result is not contemplated by the tariff.

We recognize the important function of demurrage charges in deterring the unreasonable withholding of freight cars from the channels of interstate commerce. See, Turner, Dennis & Lowry Lumber Co. v. Chicago, Milwaukee & St. Paul Ry., 1926, 271 U.S. 259, 46 S.Ct. 530, 70 L.Ed. 934. We also recognize the overriding purpose of the Interstate Commerce Act to enforce the terms of published tariffs rigorously against all carriers and shippers alike so as to prevent special concessions and discriminations in interstate railroad traffic. This policy and the purpose of the tariff would not be served by striking down as illegal the long-standing, reasonable and beneficial arrangement between these parties for utilizing otherwise empty trackage owned by appellant in order to relieve congestion at an important railroad yard on an important interstate line.

Judgments reversed.