**KANSAS CITY SOUTHERN RAILWAY COMPANY, Plaintiff,**

v.

**KANSAS CITY POWER & LIGHT COMPANY, Defendant.**

**No. 75CV546–W–1.**

United States District Court, W. D. Missouri, W. D.

July 28, 1976.

Robert K. Dreiling, Kansas City, Mo., for plaintiff.

A. Drue Jennings, Kansas City, Mo., for defendant.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER DIRECTING ENTRY OF JUDGMENT

JOHN W. OLIVER, District Judge.

*Findings of Fact*

1. We expressly adopt and incorporate by this reference all the facts stipulated by the parties in the Stipulation of Uncontroverted Facts, which was filed as Joint Exhibit A to Standard Pretrial Order No. 2.[1]

2. We also adopt and incorporate by this reference the parties' Stipulation of Documentary Evidence.[2]

3. No factual circumstances are in dispute and neither party sought to adduce any further evidence.

4. Plaintiff has conceded that it is not entitled to recovery on Bill No. I–19 for the breakdown period of August 8–August 29, 1974, in the amount of $8,230.00.

*Conclusions of Law*

1. This action seeks recovery of demurrage charges and arises under 49 U.S.C.A. Section 1, et seq. The Court has jurisdiction of the subject matter and the parties under 28 U.S.C.A. Section 1337.

2. The "demurrage tariff" in dispute, Item 618–H, Note 14, Paragraph (c) of Southwestern Freight Lines Tariff 22–E, ICC No. 4704, is ambiguous.

3. Where an ambiguous tariff is drafted by the carrier, and construction of the tariff is in doubt, such construction must be in favor of the shipper and against the carrier. Under such circumstances, the carrier must be presumed to have used language necessary to protect its interest. In this case, plaintiff's failure to provide, in the second sentence of the "demurrage tar-

1. See Appendix, Exhibit I.

2. See Appendix, Exhibit II.

iff", for the accrual of demurrage on all cars must be interpreted as plaintiff's intent that demurrage be charged only on individual cars.

■ 4. The plaintiff's method of computing demurrage, employed from July, 1967, to November, 1974, was and is the proper method to calculate demurrage under the tariff involved in this case.

5. The plaintiff's method of computing demurrage, employed from November, 1974, to the present was and is improper under the tariff involved in this case.

■ 6. Where a tariff is ambiguous, long-continued construction, uniform and clear in its purport, accepted and acquiesced in by the interested parties, must be given appropriate consideration in determining the meaning of the tariff. In this case, plaintiff's own application and construction of the tariff involved was reasonably acquiesced in by defendant for a period exceeding seven years. Plaintiff therefore construed and interpreted the tariff in the manner applied during that period of time. Defendant was therefore entitled to rely and did in fact rely on such interpretation and meaning given the tariff by plaintiff.

7. The policy underlying demurrage supports and is consistent with the manner of computing demurrage on an individual car basis, as employed in this case by plaintiff from July, 1967, to November, 1974.

■ 8. In light of the policy underlying demurrage, plaintiff's practice of switching empty rail cars from defendant's station sites, while proposing to charge demurrage on such empty and removed cars, which have been released by defendant and have been returned to the flow of commerce, would produce an incongruous result which would violate the underlying policy. Such incongruous result should be avoided, if possible.

■ 9. Defendant herein is entitled to relief from demurrage Bill Nos. H–28 and I–507, under Item 618–H, Note 14, Paragraph (d) of Southwestern Freight Lines Tariff 22–E, ICC No. 4704, by reason of a strike of defendant's employees, which lasted from July 8, 1974, to September 29, 1974, and which strike delayed and interrupted defendant's coal unloading operations at its Hawthorn and Grand Avenue Stations. *United States v. Coal Cargo* (E.D.Pa.1924) 11 F.2d 805; aff'd. 3 Cir., 11 F.2d 809, cert. denied 273 U.S. 696, 47 S.Ct. 93, 71 L.Ed. 845.

10. Plaintiff has conceded that defendant is entitled to relief from demurrage Bill No. I–19, as provided under Item 618–H, Note 14, Paragraph (d), and Note 15 involving the August, 1974, breakdown.

11. Defendant is not liable to plaintiff for any of the demurrage charges as billed and identified in Plaintiff's Exhibit No. 2.[3]

It is therefore

ORDERED that judgment should be entered for the defendant pursuant to Rule 58 of the Rules of Civil Procedure.

## APPENDIX

## EXHIBIT I.

## STIPULATION OF UNCONTROVERTED FACTS

Come now the parties above named, in compliance with paragraph G.1. of Standard Pre-Trial Order No. 1, entered herein on September 11, 1975, and hereby enter into the following stipulations:

1. Plaintiff is a Missouri corporation, duly organized under the laws of that State, with its principal place of business at Kansas City, Missouri.

2. Plaintiff is a common carrier by railroad, engaged in the transportation of property in interstate commerce and is subject to Part I of the Interstate Commerce Act (49 U.S.C. § 1, et seq.).

3. Defendant is a Missouri corporation, duly organized under the laws of that State, with its principal place of business in Kansas City, Missouri.

---

**3.** See Appendix, Exhibit III.

4. Defendant is a public utility engaged in the generation, transmission, distribution and sale of electric energy and power.

5. Defendant owns and operates two generating stations at Kansas City, Missouri, namely the Hawthorn Station and Grand Avenue Station, and Plaintiff provides rail transportation service to defendant at said generating stations.

6. In the course of its business, Defendant has occasioned to receive, at Hawthorn and Grand Avenue Stations, railroad shipments of carloads of coal, moving in interstate commerce, for use as fuel in the production of electrical energy and power. These shipments average one trainload per week at Grand Avenue Station, and one or two trainloads per week at Hawthorn Station, depending upon Defendant's fuel requirements.

7. As respects this case, the following describes the movement of rail cars used for delivery of coal to Defendant's Hawthorn and Grand Avenue Stations:

(a) Defendant purchases coal from Peabody Coal Company from the latter's mine at Chelsea, Oklahoma, which coal is loaded into rail cars, the capacity of which varies from 65 to 100 tons per car;

(b) Loaded coal cars are assembled into "trainloads" of typically 60 to 95 cars each, and moved by rail from Chelsea, Oklahoma, to Kansas City, Missouri, via the line haul carrier, St. Louis-San Francisco Railway Company (Frisco); Frisco's waybills for each trainload are provided to Plaintiff, identifying each car as shipped by Frisco;

(c) At Kansas City, Missouri, at point of "interchange", Plaintiff receives such carloads of coal and acts as switching carrier, moving said loaded cars from point of interchange to Defendant's Hawthorn Station, or defendant's Grand Avenue Station, depending upon the destination of the particular cars; Plaintiff's computer records (Form JA22) compiled upon receipt of the cars at point of interchange, identify each car actually received by Plaintiff from Frisco;

(d) Upon delivery of the cars to either of Defendant's Hawthorn or Grand Avenue Stations, Plaintiff's yard clerk commences daily physical inspections (yard checks) to ascertain the identity of cars, both loaded and unloaded, which are present at Defendant's station sites, which physical inspections result in Plaintiff's yard check reports;

(e) As Defendant completes its unloading operations and releases individual cars, such cars, as reflected by Plaintiff's yard check reports, are picked up or switched from Defendant's station sites, and returned to the Frisco, either (i) immediately, or (ii) after being combined with loaded and empty cars which have been picked up from other industrial sites in Kansas City, Missouri, or (iii) after being taken to one of Plaintiff's rail yards, to await assembly with loaded and empty cars picked up from other industrial sites in Kansas City, Missouri, as well as with additional empty cars from Defendant's station sites—for example, Plaintiff often picks up empty cars from Defendant's Hawthorn Station while Plaintiff makes its daily "evening run" to the Chemagro plant, an industrial site adjacent to Hawthorn Station;

(f) At point of interchange, cars both loaded and empty are returned to the Frisco by Plaintiff, thereby ending Plaintiff's switching responsibilities with respect to the cars so returned; and

(g) With respect to those rail cars identified in subparagraph (e)(ii) and (iii) above ("other rail cars"), which cars are picked up from other industrial sites in Kansas City, Missouri, and combined with empty cars removed from Defendant's station sites, demurrage is not assessed on said "other rail cars" once the same have left the premises of such other industrial sites.

8. Pertinent to this case, from July, 1967 to the present, Defendant received shipments of coal, and Plaintiff performed switching activities, in the manner described in paragraph 7 above.

9. The rail car movements and shipments hereinabove described are governed by the terms and conditions of Items 615–K, 616–J and 618–H of Southwestern Freight Lines Tariff 22–E, I.C.C. No. 4704, copies of which are attached hereto as Joint Exhibit B, and incorporated herein by reference. Said tariff provisions are subject to I.C.C. Service Order No. 1124, as amended, and the parties request that the Court take Judicial Notice of said Service Order.

10. Concerning rail car shipments during the period January 1, 1973, to May 31, 1975, Plaintiff has determined with respect to each shipment (a) as to each car moving in said shipments the number of days passing between the day on which a given car was delivered by Plaintiff to Defendant at either of its station sites and the day on which such car was released by Defendant, and (b) the number of days passing between the day on which a given trainload consignment was delivered to each of Defendant's station sites and the day on which the last car included in the trainload consignment was released by Defendant.

11. With respect to the tariff provisions identified in paragraph 9 above, and as shown on Joint Exhibit B, the same:

(a) were drafted by the St. Louis–San Francisco Railway Company (Frisco);

(b) were published by Southwestern Lines Freight Bureau as tariff publishing agent for its member railroads;

(c) were filed with the Interstate Commerce Commission and assigned I.C.C. No. 4704;

(d) became effective on the following dates:

| | |
|---|---|
| Item 615 | January 10, 1967 |
| Item 616 | February 12, 1967 |
| Item 618 (generally) | February 12, 1967 |
| Item 618, Note 14, Paragraph (c) | July 4, 1967 |

(e) are applied by Plaintiff as switching agent for the Frisco with respect to traffic moving thereunder.

With respect to Item 618, Note 14, Paragraph (c), Defendant is the only party with respect to whom Plaintiff applies or otherwise avails itself of said tariff provision, and Defendant is the only party with respect to whom Plaintiff delivers coal in switching service at Kansas City, Missouri-Kansas pursuant to Item 615.

12. Demurrage or detention charges are computed and assessed on the basis of a specified length of "free time", and "detention time" thereafter, with the combined free time and detention time commencing on the day of delivery and ending on the day of release.

13. From the inception (July 1967) of the "demurrage" tariff (Item 618–H, Note 14, paragraph (c)), until November 1974, Plaintiff computed and assessed Defendant detention charges with respect to the subject shipments on the basis of a combined "free time" and "detention time" commencing on the day a trainload shipment was delivered, and ending for each single car on the day such car was released by Defendant. In other words, after delivery of loaded coal cars to Defendant, Plaintiff's yard clerk would ascertain and identify which cars had been unloaded and released by Defendant. Demurrage ceased for such unloaded and released cars, which would thereafter be removed from Defendant's Station sites, and demurrage would be assessed only on remaining rail cars which in fact had not been unloaded after expiration of the 24-hour "free time" period. This manner of computing and assessing demurrage was initiated by Plaintiff in July 1967, and continued until November 1974.

14. Subsequent to November 1974, Plaintiff began computing and assessing Defendant demurrage charges in the following manner: Plaintiff determined the detention charges which are the subject matter of this action by, in each instance, computing the combined "free time" and "detention time" for all cars comprising a given trainload consignment, commencing on the day the trainload consignment was delivered to Defendant's station and ending on the day the last car included in such trainload consignment was released by Defendant. As a result of this revised manner of computing and assessing demurrage charges, Plaintiff submitted to Defendant,

in May 1975, revised demurrage bills for the period January 1, 1973, through May 31, 1975.

15. Plaintiff's Exhibit 1, which will be offered by stipulation of the parties at a later date, will consist of copies of all revised demurrage bills prepared by Plaintiff covering detention charges assessed Defendant on trainload consignments delivered by Plaintiff to Defendant during the period January 1, 1973, to May 31, 1975.

16. Plaintiff's Exhibit 2, which will be offered by stipulation of the parties at a later date, will set forth as to each demurrage bill identified in paragraph 15 above, and now in dispute:

(a) The month and year in which the detention charges are claimed to have accrued;

(b) The identification number and date of each revised bill;

(c) The identification of the particular station at which the detention charges are claimed to have accrued;

(d) The amount initially assessed and billed to Defendant;

(e) The amount Defendant paid Plaintiff with respect to such initial bills;

(f) The amount of the revised bills in accordance with Plaintiff's revised method of computing and assessing demurrage; and

(g) The amount which Plaintiff claims Defendant owes as a result of such revisions.

Other than the bills identified above which are in dispute, Defendant has paid all demurrage bills as submitted by Plaintiff for the period July, 1967 to November, 1974.

17. With respect to Bill Nos. H–28, I–19, and I–507, as shown on Plaintiff's Exhibit 2, the parties stipulate:

(a) That Defendant's union employees who work at its Hawthorn and Grand Avenue Stations were on strike from July 8, 1974, through September 29, 1974;

(b) That Defendant's unloading operations were delayed and interrupted by such strike; and

(c) That Defendant had the ability during such strike period to reduce its volume of coal shipments but, with the exception of the period of "breakdown" as noted in paragraph 18 below, did not do so.

18. With respect to Bill No. I–19 as shown on Plaintiff's Exhibit 2, the parties stipulate:

(a) That Defendant suffered a mechanical failure of its coal unloading equipment (car dumper) at its Hawthorn Station, which breakdown occurred on August 8, 1974, and lasted until August 29, 1974;

(b) That said breakdown was confirmed in writing by Defendant to Plaintiff, along with evidence that said unloading equipment was completely inoperative for the period above stated, and that normal unloading operations had been materially disrupted as a result thereof; and

(c) That during said period of breakdown Defendant halted coal shipments to its Hawthorn Station and was forced to unload a shipment already at the Station by the time-consuming process of "bottom dumping" each car.

19. From 1967 to the present, Defendant has maintained and continues to maintain the capability to unload an entire trainload consignment at its Hawthorn Station within 24 hours of receipt from Plaintiff. Defendant does not have such capability with respect to unloading operations at its Grand Avenue Station.

20. Plaintiff's answers to Defendant's Interrogatories, filed herein on December 4, 1975, and December 18, 1975, are incorporated herein by reference, with the exception that Exhibit B thereto is no longer appropriate and has been replaced by Plaintiff's Exhibit 2 as identified herein.

## WAIVER OF OBJECTION

The parties hereby waive all objections to admissibility on any ground of the evidence and exhibits set forth in the above and

foregoing Stipulation of Uncontroverted Facts.

Respectfully submitted,

/s/Robert K. Dreiling

Robert K. Dreiling
114 West 11th Street
Kansas City, Missouri 64105
Phone: 816-842-7887

Attorney for Plaintiff The Kansas City Southern Railway Company

/s/A. Drue Jennings

A. Drue Jennings
1330 Baltimore Avenue
Kansas City, Missouri 64105
Phone: 816-471-0060

Attorney for Defendant Kansas City Power & Light Company

EXHIBIT II.

## STIPULATION OF DOCUMENTARY EVIDENCE

The parties hereby stipulate that the following items of documentary evidence, as identified, may be accepted by the court as evidence in this matter and the parties hereby waive all objections as to admissibility on any ground:

1. The parties Joint Exhibit "B," consisting of copies of Items 615-K, 616-J and 618-H of Southwestern Freight Lines Tariff 22-E, I.C.C. No. 4704, which exhibit has already been identified as Joint Exhibit B and filed with this court as part of the Standard Pretrial Order No. 2 filed herein on March 22, 1976;

2. Plaintiff's Exhibit No. 1 consisting of copies of revised demurrage bills covering the period January 1, 1973, through May 1, 1975, true copies of which are attached hereto;

3. Plaintiff's Exhibit No. 2 consisting of a one sheet summary of all bills identified in Plaintiff's Exhibit No. 1 and, with respect to such bills setting forth the following information:

(a) The month and year in which the detention charges are claimed to have accrued;

(b) The identification number and date of each revised bill;

(c) The identification of the particular station at which the detention charges are claimed to have accrued;

(d) The amount initially assessed and billed to Defendant;

(e) The amount Defendant paid Plaintiff with respect to such initial bills;

(f) The amount of the revised bills in accordance with Plaintiff's revised method of computing and assessing demurrage. A true copy of Plaintiff's Exhibit No. 2 is attached hereto; and

4. Plaintiff's Exhibit No. 3, consisting of a true copy of I.C.C. Service Order No. 1124, which exhibit shall be delivered to the Court at the time of the filing of this stipulation.

## FURTHER STIPULATION OF UNCONTROVERTED FACTS

In addition to the Stipulation of Uncontroverted Facts, heretofore filed with this Court as the parties' Joint Exhibit "A" to the Standard Pretrial Order No. 2, filed herein on March 22, 1976, the parties enter into the following further stipulation of fact:

1. If the Court should find, in interpreting Item 16-H, Note 14, Paragraph (c) of the parties Joint Exhibit B, that the method for computing demurrage utilized by plaintiff between July of 1967 and November of 1974, as described in Stipulation No. 13 of the parties Stipulation of Uncontroverted Facts, is proper as prescribed by such tariff provision, then defendant is not liable to plaintiff under Plaintiff's Complaint filed herein.

Respectfully submitted,

/s/Robert K. Dreiling

ROBERT K. DREILING
114 West 11th Street,
Kansas City, Missouri 64105
Phone: a/c (816)-842-7887

Attorney for Plaintiff The Kansas City Southern Railway Company

/s/A. Drue Jennings
A. DRUE JENNINGS
1330 Baltimore Avenue
Kansas City, Missouri 64105
Phone: a/c (816)–471–0060
Attorney for Defendant Kansas City Power & Light Company

EXHIBIT III.

P. Ex. 2—A document comprised of approximately one hundred and thirty (130) pages consisting of plaintiff's business form JA22 setting forth all trainload shipments received by plaintiff in interchange from St. Louis-San Francisco Railway Co. of all cars upon which demurrage is herein claimed and stating, as to each such trainload shipment, date and hour of receipt, commodity, consignee, destination, inbound rail carrier, number of cars, car ownership and car numbers.