# MENASHA PAPER COMPANY *v.* CHICAGO & NORTHWESTERN RAILWAY COMPANY.

### ERROR TO THE SUPREME COURT OF THE STATE OF WISCONSIN.

No. 696.  Argued April 3, 1916.—Decided April 24, 1916.

The Hepburn Act of 1906 amending the Act to Regulate Commerce requires railroad companies to provide and furnish transportation to shippers on reasonable request therefor.

Where shippers, who are under contract to deliver interstate shipments in carload lots, call upon an interstate carrier for cars, the carrier is bound to furnish them, and the consignee cannot refuse delivery and by notifying the carrier of its intention to do so, relieve itself of demurrage charges according to the published tariff.

An interstate carrier cannot, at the request of a consignee who is under contract to receive interstate shipments, declare an embargo on the shipments and refuse to furnish cars for the shippers; and if it temporarily does so and then removes the embargo, the latter act is but a return to its duty under the Act; and failure to notify the consignee of its action does not relieve the latter from liability for demurrage provided by the published tariff.

Published rules relating to tariffs of interstate carriers must have a reasonable construction.

The fact that an interstate carrier complied with the request of a consignee having a private siding to deliver daily on its siding only the number of cars that could be conveniently handled, although more could be actually placed on such siding, did not in this case relieve the consignee from demurrage charges specified in the published tariff on cars held by the carrier awaiting the consignee's convenience after arrival and readiness to deliver on the siding.

159 Wisconsin, 508, affirmed.

THE facts, which involve the right of a railroad to collect demurrage on cars in interstate and intrastate commerce, are stated in the opinion.

*Mr. Felix J. Streyckmans* for plaintiff in error.

*Mr. Louis Quarles,* with whom *Mr. Willet M. Spooner* and *Mr. George Lines* were on the brief, for defendant in error.

MR. JUSTICE McKENNA delivered the opinion of the court.

Action for demurrage on cars in interstate and intrastate commerce, the grounds of recovery being set forth in separate counts.

After trial judgment was entered for the railway company in the sum of $1,374.63 and $49.60 costs, being in all the sum of $1,424.23.

The judgment was affirmed by the Supreme Court of the State.

There is no dispute about the facts. The railway company operates a railroad at Menasha, Wisconsin, and elsewhere. The paper company is a corporation and has a place of business adjoining the railroad of the railway company and operated, for the purpose of unloading the cars delivered to it, a sidetrack which was contiguous to its mill and connected with the tracks of the railway company. A delay of forty-eight hours was allowed for unloading; after that time a demurrage charge of $1.00 per car per day was provided by the rules of the railway company.

The sidetrack could accommodate about seven cars but had an actual capacity, as used during the times with which the action is concerned, of three or four cars, or possibly of five. As the paper company used the sidetrack, more cars could not have been placed upon it and unloaded than were actually placed upon it and unloaded, that is, about two or three cars a day.

Notice of the arrival of each car was given and acknowledged by telephone, and the railway company held the cars for unloading either at Menasha station or afterwards at Snell's siding, eight miles south of Menasha. The paper company did not ask for them sooner than shown in the complaint because it could not handle any more cars than it did. And there was neither inability nor refusal on the part of the railway company to so place the cars when so ordered.

On March 14, 1908, the railway company, at the request of the paper company, notified its agents in Wisconsin and Michigan "until further advised" to discontinue to furnish equipment to load with bolts (logs less than 8 feet in length) for the paper company. This arrangement, called an "embargo," did not run out until the close of the year and did not by its terms cover logs, nor was it modified afterwards to cover logs. The embargo was raised at the paper company's request as to a certain

number of cars but was applied again and bolts were shipped in violation thereof and without any notice from the railway company to the paper company of the intention to ship the same, resulting in the arrival of cars in great numbers on certain days.

From these facts it was concluded by the referee, to whom the case was referred; the trial court and the Supreme Court that the paper company was estopped from urging any defense—other than the existence of the embargo and that the embargo was "illegal, contrary to public policy, and void."

The latter conclusion the court based on the Hepburn Act (June 29, 1906, c. 3591, 34 Stat. 584) and certain sections of the Wisconsin laws.

The case is in short compass. The first cause of action was for intrastate demurrage on logs; the second cause of action was for interstate demurrage on logs and bolts. The so-called embargo is applicable only to the bolts. The Supreme Court disposed of it, as we have seen, on the ground that it was opposed to the policy of the Federal and state laws and justified the railway company in removing it. And the court found that there was no agreement that notice should be given of its removal. The removal of the embargo undoubtedly produced a congestion of cars beyond the ability of the paper company to handle on its sidetrack in its usual way.

Two questions arise on the embargo: (1) Was it a violation of the Hepburn Act? (2) If so, could the railway company recover on account of the congestion of cars resulting from its removal? That act requires railroad companies to provide and furnish transportation to shippers upon reasonable request therefor, and to exact this duty of the railway company was the right of the shippers of the bolts to the paper company. *Chicago, R. I. & Pac. Ry.* v. *Hardwick Elevator Co.*, 226 U. S. 426. This is not denied by the paper company nor did that company re-

fuse to receive the cars. It is an inference from this that the paper company recognized it was under contract obligations to the shippers to receive the bolts; indeed, the whole case supposes it. It is alleged that "between June 3, 1908, and July 20, 1908, both dates included, plaintiff [the railway company], as the last carrier, carried and delivered in interstate commerce certain freight in carload" lots (meaning the bolts). There is no denial that they were so carried. If the shippers had a right to send the bolts' necessarily the railway company was under a duty to transport them. The contention of the paper company, therefore, is tantamount to saying that the railway company performed its duty at the sacrifice of its rights. We are unable to concur in this view. The railway company violated its duty when it agreed to the embargo; it returned to its duty when it removed the embargo, and the rights which it exercised where those which it would have had if there had been no agreement between it and the paper company. The paper company had a direct remedy if it had been under no obligation to receive the bolts; it could have peremptorily notified the shippers not to send them, and such notice, under the circumstances, was an obvious course. It could not be protected from their receipt nor relieved from the obligation of their receipt by an agreement with the railway company against the duty which the law devolved upon the latter company. This duty it was deemed necessary to impose. It is positive and should be kept clear from agreements with others than the shippers which in effect stipulate for its violation. And this is the basis of our decision. If the paper company was under no obligation to receive the bolts from the shippers of them it undoubtedly had the right to effectually notify the railway company not to receive them for shipment on its account except as it should direct. But, as we have seen, it received the cars, and this, we have said, was a recognition of the rights of

the shippers. The cars did not arrive all at once, and a protest made at the first delivery of cars would have notified the railway company that the paper company was under no obligations to the shippers. And this certainly was the more imperative, as the railway company was the last carrier, the shipments originating on other roads.

It seems that in the state court the paper company did not contend so much against the raising of the embargo as against the failure to give notice of it, with the consequence, it was asserted and is asserted here, of the "dumping of a large number of cars" on the paper company "and causing the accrual of the alleged demurrage sued for." But the contention is based upon the legality of the embargo, it being tantamount, it is insisted, to a consignee refusing freight consigned to it or the designation of those from whom it would receive freight. It, however, gave no notice to its consignors; it undertook to put the railway between itself and them, casting upon the railway company the hazard of the violation of its obligations, it having the ability to perform them and the shippers having the right to demand performance of them. It, besides, received the cars without protest or comment and made no provision for their disposition. The finding is "that defendant did not order cars placed for unloading sooner than as shown in Exhibits B and C, attached to the complaint, because, practically, defendant could not handle any more cars than it did, and hence did not ask for them." This finding applies, of course, to the placing of cars on the paper company's sidetrack. What other accommodation and arrangements it could have made does not appear from the findings, but it was testified that the paper company, if the cars had been delivered to it, could have obtained space for unloading them. The company, however, made no demand for such delivery and the referee found that the railway company "notified the defendant [paper company] upon each ar-

rival by telephone, giving the car numbers, and, according to custom, with only occasional exceptions, the plaintiff held the cars until defendant notified it to place them upon the sidetrack for unloading." And the referee also found that there was no delinquency on the part of the railway company nor insufficiency of terminal facilities.

The next contention of the paper company (it is the first discussed) is that "under the Commerce Act railroads cannot collect for any service not 'specifically set forth in the carrier's published tariffs' and tariffs and schedules must plainly show what the charges are for." These conditions, it is urged, were not satisfied by the rules of the company and the circumstances presented in this case.

The rules of the company were as follows:

"Rule 4. Cars which are stopped in transit or held by orders of shippers or consignees for reconsignment to points beyond, for change of load, for amended instructions, for change in billing, milling, shelling, cleaning, etc., or on account of improper, unsafe or excessive loading, or for any other reason for which the shipper or consignee is responsible, shall be subject to Car Service charges after the expiration of forty-eight (48) hours from arrival at the point of stoppage, and all Car Service must be collected, or billed as advances when cars go forward.

"Rule 5.   .   .   .

"Section B. Cars for unloading shall be considered placed when such cars are held awaiting orders from consignors or consignees, or for the payment of freight charges after the notice mailed or otherwise given, or for the surrender of bills of lading.

"Section C. The delivery of cars to private tracks shall be considered to have been made, either when such cars have been placed on the tracks designated, or, if such track or tracks be full, when the road offering the cars

would have made delivery had the condition of such tracks permitted."

It is somewhat difficult to state succinctly the argument of counsel by which he attempted to give pertinency to the contention based on these rules. We have seen that the sidetrack of the paper company could accommodate about seven cars, but as the company used the track it could handle only two or three cars a day and hence it did not ask for more. The Supreme Court of the State, therefore, decided that the railway company had complied with its obligation to the paper company by complying with such demand and was entitled to charge for demurrage. And answering the contention of the paper company (repeated here), the court said the railway "was not obliged to do a vain and useless thing by putting seven cars upon the track at one time and thus prevent the practical handling or unloading of any cars thereon by appellant [paper company] contrary to its orders." The court, by such holding, counsel says, decided that "the rules must have a reasonable construction." And, further, "This is the crux of the decision and it is absolutely in opposition to all of the decisions of the Interstate Commerce Commission and of the courts and of the spirit and intent of the Act to Regulate Commerce." In other words, counsel insists that there should have been an actual filling of the tracks even though this would have prevented their use and have been contrary to the directions of the company, the basis of the contention being "that the rules must be strictly construed and that there must be 'definite tariff authority' for the charges made." And the conclusion, it is asserted, is supported by all authorities, judicial, administrative and legislative. Rigorously applying the test that the exact letter of the statute must be observed, counsel goes so far as to assert that there was an imperative duty upon the railway company to so fill the tracks, and this without orders. And contesting the proposition,

decided by the Supreme Court of the State, that cars arriving at Menasha or Snell's siding had reached their destination, counsel says: "It was the duty of the railroad to keep the sidetrack filled to its physical capacity before it could hold the cars 'at the nearest available point.' To hold otherwise would leave it dependent upon the judgment of the officers of the railroad as to how much unloading the consignee could do, and would therefore result in discrimination and special privileges prohibited by the Act to Regulate Commerce." And further: "The carrier was derelict in its duty when it failed to fill the sidetrack to its capacity as it had not completed its duty as a common carrier until it had placed the cars on the sidetrack of the plaintiff in error."

We are unable to concur in counsel's construction of the rules or to hold that it has any such formidable support as he assigns to it. And we content ourselves with the bare assertion, not even pausing to review counsel's chief reliance, that is, *United States* v. *Denver & Rio Grande R. R.*, 18 I. C. C. 7. The case has not the breadth given to it. If it had we should be unable to follow it.

A motion has been made to dismiss, but it is apparent from our discussion that a Federal question was presented in the case and decided by the court. The motion, therefore, must be overruled, and the judgment

*Affirmed.*