SOUTHERN RY. CO.

v.

ALUMINUM CO. OF AMERICA.

Civ. No. 977.

United States District Court,
E. D. Tennessee, N. D.

June 2, 1951.

Clyde W. Key and Charles H. Smith, Knoxville, Tenn., for plaintiff.

R. R. Kramer, Knoxville, Tenn., for defendant.

DARR, Chief Judge.

The Southern Railway Company sues the Aluminum Company of America for demurrage, amounting to $99,499.96 and interest, covering the period from April 1, 1945 to October 31, 1946. The claim is in connection with the defendant's operations at Alcoa, Tennessee.

The defendant began operations at Alcoa in 1913, and now owns and operates aluminum reduction and fabricating plants and a carbon electrode making plant. These are located approximately

one mile north of Maryville and fifteen miles south of Knoxville, Tennessee. Railway service is rendered the three plants by plaintiff and by the Louisville & Nashville Railroad Company, from their respective branch lines running from Knoxville to Maryville.

When the defendant began its operations in 1913 and 1914, the plaintiff did not have at Alcoa adequate yard and switching facilities for the storage of freight cars. Consequently the defendant constructed on its own property and at its own expense adequate track facilities for the marshalling and sorting of cars, preparatory to "spotting" them for loading and unloading purposes. These facilities were in excess of what would otherwise have been required for its operations.

At that time both the plaintiff and defendant contemplated that the plaintiff would perform all switching services.

These track facilities or yards were enclosed by a fence, the gates to which, however, were left open and afforded plaintiff full access thereto. The three separate plants were located, one at Alcoa near the yards, one about a mile north and the third about two and a half miles south; and each of them was enclosed by a fence, the gates to which were kept locked except when opened for railway or other such service.

From the beginning of operations in 1913 up to December 31, 1920, the plaintiff performed all such switching operations for both empty and loaded cars, which were brought by it to defendant's plants. This included the placing at the loading or unloading points within each plant's fenced enclosure, of all such freight cars which were to be loaded or unloaded by defendant. These operations included also the removal from said loading points of such loaded cars for further transportation, and the removal from unloading points of such empty cars as were released by defendant to the plaintiff. Under this method of operation many of the empty cars brought to defendant were moved on to defendant's track facilities or yards, where they were permitted to remain for varying periods of time. Later the plaintiff would switch from the yards to the loading points within the fenced enclosures, as many of such cars as defendant ordered for loading.

Additional cars were sometimes switched by the plaintiff directly from its own tracks to defendant's loading or unloading points without being set out on defendant's yards.

During this same period, when loaded cars which had been placed at proper unloading points by the plaintiff were made empty, some of such cars were first switched from such points by the plaintiff to defendant's yards where they were permitted to remain for some period of time before being moved by the plaintiff from said yards to the plaintiff's own tracks. Other such cars, after being made empty, were removed by the plaintiff from said unloading points directly to the plaintiff's own tracks without being set out in the yards.

The plaintiff performed these switching operations with its own equipment and employees and at its own expense; and defendant maintained no equipment or employees to perform such operations.

During this period of eight years, defendant's yards were in fact merely yard switching tracks used by the plaintiff principally for marshalling, sorting and classifying freight cars destined to or received from defendant.

Under this custom, established by practice and mutual understanding during this period, time was computed under the demurrage rules only after empty cars had actually been placed by the plaintiff at loading points designated by defendant. No demurrage was charged by the plaintiff or paid by defendant on empty cars while they were stored or standing on defendant's yards.

In November 1920, the plaintiff gave notice to defendant that it would not perform the switching service referred to above after a designated date, later changed to January 1, 1921.

The evident intention of both parties was that the yards would thereafter be used by the plaintiff as an assembly or storage yard as had been previously used when the plaintiff performed the switching.

Since that date the plaintiff has performed no "spotting" service or placement of cars at loading and unloading points. But no change was made in the matter of demurrage accounting.

As defendant's business greatly increased in volume, resulting in a corresponding increase in the railway service required, defendant enlarged its plants in the year 1941 and constructed new track facilities, or yards, at a new location, so as to provide adequate yards for the marshalling, sorting, classifying and interchanging of cars. Again, no change was made in the demurrage accounting practice.

And thus, throughout the period from January 1, 1921, when switching operations were changed, to November 1, 1946, no demurrage was charged or demanded by the plaintiff on empty cars put into either the original yards or the new enlarged yards until such time as such cars were removed from the yards to the designated loading points in the plants. And this was true as to empty cars whether placed by request of the defendant to the plaintiff or received from the plaintiff through its conductor by action of defendant's yardmaster. Also the same reckoning for demurrage was used on cars that came in loaded and thereafter unloaded and then used for outbound shipments by defendant.

Throughout this period, the plaintiff and defendant followed several consistent practices, namely:

(a) All loaded cars consigned to defendant's plants as well as all empty cars intended therefor, were placed by the plaintiff in defendant's yards upon tracks designated therefor, such cars being usually placed without any separation or classification with respect to type, size or contents of cars. The incoming track was the Lead Track and the outgoing track was Track No. 4.

(b) Defendant performed the task of sorting the cars and classifying them as to size and type of empty cars placed by the plaintiff on said tracks.

(c) Defendant moved such empty cars of proper sizes and types as were needed for loading to the proper loading points, and also moved such loaded cars from said yards to the proper unloading points in its plants, and when unloaded moved these empty cars to points for loading, some of which were first moved to the yards.

(d) During the period from a date slightly subsequent to July 1, 1932 to November 1, 1946, defendant, at the request of the plaintiff, furnished to the plaintiff daily reports indicating the dates on which defendant removed empty cars from the yards.

(e) During the period from 1921 to November 1, 1946, defendant informed the plaintiff daily of the number of empty cars which defendant would require for loading its shipments.

(f) The defendant daily informed the plaintiff of the number of cars on hand, indicating the types in the yards. This was done whether request for other cars was made.

In estimating and informing the plaintiff of the number of empty cars needed for its future loading, defendant would ordinarily, but not always, specify the class, type and size of cars required. On occasions the plaintiff was not able to furnish all the cars thus indicated by defendant. On other occasions, the plaintiff would have available at Knoxville, Tennessee, or at some other intermediate point between Knoxville and Alcoa, cars in excess of the number requested by defendant, which cars were of a class, type and size known by the plaintiff to be suitable for defendant's needs. In some such instances, some of the empty cars in excess of those so requested by defendant, were carried by the plaintiff to defendant's yards and left there.

Throughout the period from 1921 to 1946, time was computed against defendant for demurrage purposes as though cars delivered by the plaintiff were delivered to and accepted by defendant at the time they were removed by defendant from the tracks in the yards aforesaid to be taken to loading points in the plants.

During all the period for which a recovery for demurrage is sought herein, defendant has paid to the plaintiff the full demurrage at the rates fixed in the plaintiff's tariffs accruing on that basis. The parties have maintained a Written Average Agreement, as provided in Rule 9 of said tariff.

While most of the excess cars left by the plaintiff in the yards were sooner or later used by defendant for loading, such was not the universal practice. When excess cars were left in the yards and defendant did not have room to take care of them, the plaintiff would, upon being notified to that effect, remove the cars from the yards. Also on one occasion, some fifteen or twenty new cars belonging to Southern Pacific Railroad, while in transit from St. Louis, were with the consent of defendant "stored" by the plaintiff in the yards for an undisclosed period of time.

Thus *all* cars left in the yards were not necessarily for use by defendant, and the plaintiff was afforded full access to the yards to remove cars in such cases. In fact, there is nothing in this record to deny to the plaintiff the privilege of removing any car from the yards in case it desired to do so, so long as it complied with its obligation to provide defendant with its requirements. As shown elsewhere, there were maintained on hand in the yards an average of four times the number of cars needed by defendant.

The demurrage tariff in effect during the period involved is Freight Tariff No. 4–Y, Association of American Railroads, Tariff Bureau, I.C.C. No. 3936, issued December 28, 1944, effective February 5, 1945, and supplements thereto.

The plaintiff contends that its interpretation of the tariffs since 1921 has been erroneous, and that demurrage time should have been calculated from the time of delivery of cars to the yards, or when loaded cars were emptied and to be reloaded, rather than from the time of spotting or placing the cars at loading points.

The defendant insists that the practice followed since 1921 was correct, that such practice was consistent with the provisions of the tariff; and that, having paid all the demurrage accruing on that basis, and all demanded by the plaintiff, it is not liable herein.

Beyond a doubt, as the parties themselves agree, the published tariffs of the plaintiff are binding on both carrier and shipper and the shipper's liability under such tariffs cannot be waived by any arrangement, understanding or course of conduct between the parties. 49 U.S.C.A. §§ 2, 3 (1), 6 (7); Lowden v. Simonds-Shields-Lonsdale Grain Co., 306 U.S. 516, 59 S.Ct. 612, 83 L.Ed. 953; Pacific Portland Cement Co. v. Western Pac. R. Co., 9 Cir., 184 F.2d 34.

The Court is of the opinion that the plaintiff's tariffs themselves impose no liability on defendant for the claimed demurrage under the facts of the present case for the reason that the interpretation of the tariffs by the parties, under which demurrage has been charged and paid, was correct.

Rule 1, Sec. A, Item 500, of the Tariff provides: "Cars of either railroad or private ownership, held for or by consignors or consignees for loading, unloading, forwarding directions or for any other purpose * * * are subject to these demurrage rules".

By Rule 2, sec. A, Item 505, "Forty-eight hours' (two days) free time will be allowed to partly or completely load, to partly or completely unload, or to partly unload and partly reload, all commodities".

The method of determining when this full time begins is set out in Rule 3, Item

510; and in Rule 6, secs. A and D, Item 525 of the tariff. Only actual placement is involved in this suit, no claim being made based on constructive placement.

Rule 6, sec. A, Item No. 525, provides that cars for loading will be considered placed when such cars are *actually placed* or *held* on *orders* of the consignor. By Note 1, under Rule 3, sec. D, "Actual Placement" is made when a car is placed in an accessible position for loading or unloading or at a point previously designated by the consignor or consignee.

Rule 6, sec. D, Item 525 provides: "If an empty car is appropriated without being ordered, it shall be considered as having been ordered and actually placed at the time so appropriated".

Under these rules there was no "actual placement" of these cars when they were delivered into the yards, and they were not "ordered" by defendant in the sense that the rule contemplates.

Neither was there a definitely established "interchange track" referred to in sec. E–1 of Rule 3. The letter written by the plaintiff to defendant on November 1, 1920, when the plaintiff discontinued its switching operations, which became effective January 1, 1921, said:

"On this date all cars consigned to your Company at Maryville and Alcoa will be placed inside the gate at our main line connection with your track at Alcoa. We will likewise receive from your Company at this same point all cars to be forwarded via our line".

This is the only written agreement about the delivery and return of cars into and out of the yards. This does not establish an "interchange track" on which delivery of cars will absolutely be accepted or returned. The only pretense of an established "interchange track" was by an informal arrangement, generally but not always followed, that incoming cars would be left on the "Lead Track" and outgoing cars on Track No. 4. This was evidently a matter of convenience to avoid confusion in handling and not to establish any legal rights in the cars.

As to the meaning of the phrase, "from the first 7:00 a. m. after *actual* or constructive *placement* on such interchange tracks", which is found in sec. E–1, it is necessary to look to Note 1, under sec. D, Rule 3, where it is said: " 'Actual Placement' is made when a car is placed in an accessible position for loading or unloading or at a point previously designated by the consignor or consignee". Furthermore the cars were not held in the yards on "orders" of defendant. It is true that once each day defendant informed the plaintiff of the number of cars, if any, needed for future loadings. Each day also defendant was required to report the number of cars on hand in the yards.

The information given the plaintiff in such cases as to the number of cars needed was not an "order" for cars. Some days defendant needed no cars, but nevertheless it was required to inform the plaintiff of the number of cars on hand.

The train sheets for the month of July, 1945, which month was used for detailed operational purpose as a typical month, shows that for that month the average daily estimate of the number of cars requested was nine plus, while the average number on hand daily was forty-one plus. In other words there were each day on hand in the yards more than four times the number of cars requested daily.

The plaintiff frequently had extra cars in its train in addition to the ones requested by defendant. It was the custom that often such extra cars were left in the yards at the same time that the cars requested were left. They were left with the consent of defendant's yard foreman to be used if defendant had room for and needed them; otherwise to be turned back to the plaintiff. When they were turned back they were picked up by the plaintiff's train on its return trip the same day. But generally the extra cars were left to be used when needed. When they were to be returned they remained stored in the yards for the day. A persuasive situation is that the plaintiff had no adequate yard facilities near the defendant's plants to store

cars whereby they would be available for the uses of the defendant.

During the month of July 1945, out of three hundred empty cars that were left in the yards by the plaintiff, eighty were in excess of those requested by defendant. On these eighty cars which defendant had not requested, the plaintiff in this suit claims demurrage of $2971.10.

As an illustration, Pa. Car 58574 was an "excess" car, left in the yards on July 19th *without any request from defendant*. Defendant placed the car for loading on July 28th and released it loaded on July 31st. The plaintiff now claims demurrage, beginning July 19th, or a total of $103.40.

Similarly on Pa. 90841, left at the yards without request of defendant on June 20th, placed by defendant for loading on July 2nd and released the same day, the plaintiff claims demurrage time from June 20th, amounting to $119.90. Other cars show the same or a similar situation.

The plaintiff thus, for the one typical month alone, is seeking by its "new" interpretation of the tariffs to collect from defendant $2971.10 for cars left in the yards without the semblance of a request from defendant, when there were already in the yards four times as many cars as defendant needed.

Defendant relied on the intentions and understanding of the parties that its appropriation of the cars did not occur until a car was moved from the yards for placement at places for loading. Consequently the defendant moved cars from the yards for loading without reference to their age coming in. This, therefore, resulted in cars often remaining in the yards for many days, which as now claimed by the plaintiff would accrue debits for demurrage, while cars coming in later would be placed, loaded and released without corresponding credits.

Subsequent to January 1, 1921, when defendant took over the switching operation with respect to incoming loaded cars which, after unloading, were retained by defendant to be reloaded, the same practice was followed as previously. That is to say, such unloaded cars were placed in the yards to be later moved to a loading point as needed. As the unloading and reloading constitute, under Rule 2, sec. A-2, Item 505, two separate demurrage transactions, the unloaded car when left in the yards was treated as not subject to demurrage; and the demurrage time would begin when it was moved to a loading point, as in the case of other cars in the yards. The plaintiff would get notice of the unloaded cars when the daily report of on-hand cars was made. This method of operation seems consistent with the tariff, and was established by mutual consent.

From all of the foregoing the Court concludes: The unloaded cars were not left in the yards upon the order of defendant; such cars were not held or appropriated by defendant when they were delivered to the yards and not until they were moved from the yards and spotted for loading; and that demurrage time did not begin to run until actual placement in an accessible position for loading.

This was the interpretation placed on the tariffs by the plaintiff for more than thirty years. It prepared and filed its tariffs. It should know what they mean, and how they should be interpreted under factual situations. There is no claim that a preference was intended by either party; and the interpretation made was in complete good faith. In addition, the plaintiff, in association with other carriers, maintained the Southeastern Demurrage and Storage Bureau, whose functions were to interpret and enforce Demurrage Tariff Rules. That Bureau from 1920 to 1932 kept one or more employees at defendant's plants whose sole function was to check freight cars for demurrage purposes. Retrenchment caused the Bureau to discontinue its on-the-job inspection in 1932, but the same practices for demurrage were continued with its approval until November 1, 1946.

This Bureau, trained and experienced in demurrage problems for many carriers over a large area, by its own per-

sonal inspections over a period of twelve years and by express concurrence for a period of more than twenty-five years, has considered that demurrage time for defendant began to run when the cars were moved from the yards and spotted for loading. Such an interpretation is undoubtedly sound.

This practice having been maintained for so long a time, a fair assumption is that the Interstate Commerce Commission had knowledge thereof and hence there is administrative approval.

This case is very similar in principle to Pacific Portland Cement Co. v. Western Pac. R. Co., 9 Cir., 184 F.2d 34, certiorari denied 340 U.S. 906, 71 S.Ct. 282, 95 L.Ed. 655, wherein the shipper was held not liable.

Published rules relating to tariffs of interstate carriers must have a reasonable construction. Menasha Paper Co. v. Chicago & Northern Ry. Co., 241 U.S. 55, 36 S.Ct. 501, 60 L.Ed. 885.

The demurrage rules promulgated by a carrier must in all instances be construed most favorably to the shipper. 13 C.J.S., Carriers, § 343; United States Fidelity & Guaranty Co. v. Central of Georgia R. Co., 226 Ala. 606, 147 So. 891, 87 A.L.R. 1028.

The imposition of demurrage implies delay through negligence or inattention or a retention for personal uses, whereby the proper office of the cars in transportation is impaired. Turner, Dennis & Lowry Lumber Co. v. Chicago, M. & St. P. Ry. Co., D.C., 2 F.2d 291, 296, affirmed in 271 U.S. 259, 46 S.Ct. 530, 70 L.Ed. 934.

No demurrage can be exacted by a carrier unless the delay in loading is clearly attributable to the fault of the shipper or consignee. United States Fidelity & Guaranty Co. v. Central of Georgia R. Co., supra.

The fundamental principle prompting charges for demurrage is to prevent undue delay in the use of cars for transportation. The situation reflected in this case does not indicate unusual delay in a holding of cars. The result would have been the same had the plaintiff maintained its own switch yard.

The only adequate available yard space the plaintiff had for pooling cars for the defendant's need was at Knoxville. Proper operation of the business of the plaintiff and defendant would have required the plaintiff to maintain a pool of cars at Knoxville in approximately the same amount kept in the yards at defendant's plants and would have required plaintiff to move these cars from Knoxville to defendant's plants when ordered for loading. Even when plaintiff performed the switching and spotting of cars, the yards were used by the plaintiff as a place of assembling cars and maintaining a car pool. There was no change in the operation of the yards after plaintiff discontinued the switching. The yards were used for the same purpose. Therefore, the use of the yards at defendant's plants was primarily for the plaintiff's benefit.

The demurrage claimed cannot be allowed under the facts.

A judgment is awarded the defendant.

Proposed findings of fact and conclusions of law will be submitted.