INDIANA HARBOR BELT RAILROAD COMPANY, Plaintiff-Appellant, *v.*
THE BUDD COMPANY, Defendant-Appellee.

First District (5th Division)  No. 79-1034

Opinion filed May 23, 1980.—Rehearing denied September 2, 1980.

Anna M. Kelly, of Chicago, for appellant.

Vedder, Price, Kaufman & Kammholz, of Chicago (Victor L. Lewis, Allan E. Lapidus, and Richard A. Kaminsky, of counsel), for appellee.

Mr. PRESIDING JUSTICE SULLIVAN delivered the opinion of the court:

Plaintiff appeals from a summary judgment entered in defendant's favor in an action to collect accrued demurrage charges, and the sole issue is the propriety of the judgment.

Defendant, a manufacturer of stampings for the automobile industry, has maintained a plant in Gary, Indiana, since 1950. The plant is adjacent to the tracks of plaintiff and the Pennsylvania Railroad Company—both of which supply defendant with empty freight cars and remove the cars from the plant after they are loaded. The empty cars would be brought to defendant's plant and left on defendant's tracks where they would remain until defendant's crews brought them to the loading area. Plaintiff had always assessed demurrage charges on its cars from the time defendant switched the empty cars to the loading area. In 1973, however, plaintiff concluded that the parties had improperly interpreted the tariff governing the computation of demurrage and, in October of that year, it began assessing demurrage from the time it first placed the cars on defendant's tracks. Defendant paid these new charges from that time, but refused to pay additional demurrage charges for the previous three years recomputed under this new interpretation of the tariff.

Plaintiff then brought the instant action seeking to recover the

additional charges for the three immediately preceding years, as allowed by section 16(3) of the Interstate Commerce Act (49 U.S.C. §16(3) (1976)). Defendant counterclaimed for the amount of the increase in charges it had paid since October 1973, on the basis that the amount collected exceeded that contemplated in the tariff. Discovery commenced which included a request for admission of facts regarding matters which had occurred since 1951 but, on motion of plaintiff, the trial court limited the request to matters arising in or after 1968.

Defendant eventually moved for summary judgment, and included among the attached supporting documents was part of the deposition of Paul Telep, who was defendant's traffic manager. He stated that a meeting was held in 1951 between representatives of plaintiff, defendant, Pennsylvania Railroad, and the Demurrage and Storage Bureau (an agency which settles disputes in the interpretation of tariffs); that at this meeting the tariff was interpreted as requiring plaintiff to begin assessing demurrage from the first 7 a.m. after cars were apporpriated for loading by defendant's switching crews; that no one from the Interstate Commerce Commission (ICC) ever took exception to this interpretation; that the railroads would deliver 10 to 12 empty cars at a time and place them on lead tracks in the plant; that the switching of cars within the plant was handled by defendant's engines and crews; that every day defendant furnished the records of its cars in the plant to aid plaintiff in assessing demurrage; that in 1950 and 1951, plaintiff "many times" delivered cars to the lead tracks which defendant had not ordered; that defendant did not ask that they be removed "because we had the room at the time in the yard so it wouldn't be necessary"; that in 1955, defendant constructed new tracks in its plant and continued to add tracks into the 1960's as business grew; that the purpose of these tracks was to store empty cars until they could be loaded; and that the empty cars could not be kept at the railroad's yards because "[t]hey could not give us that type of switching."

Portions of the deposition of Robert Bowser, defendant's assistant traffic manager from 1950 to 1970 and traffic manager thereafter, were also attached, in which he stated that defendant did not give plaintiff particular instructions as to where the empty cars should be parked upon delivery and that "[f]or the most part [defendant] left it to [plaintiff's] discretion as long as they followed normal operating procedures where basically they didn't block main switches and their own line of movement"; that plaintiff left empty cars and picked up loaded cars at tracks designated A through E; that "[t]hey were tracks where the railroads delivered cars to [defendant], so they were interchange tracks"; that until 1973, demurrage was assessed from the first 7 a.m. after the cars were removed from tracks A through E and taken by defendant to one of

its buildings for loading; and that defendant's engines and crews would bring the cars from the storage areas to the loading docks and also return them after they were loaded.

Also attached was an affidavit of Bowser, containing much of his deposition testimony but also stating that the additional tracks defendant had constructed "served as a supplement to the railroad's yards and enabled the railroads to place cars on the plant tracks which otherwise would have been kept in the railroad's yards"; that plaintiff often delivered cars that defendant had not ordered; that while defendant would occasionally request plaintiff to remove the unordered cars if there was no room for them, they were generally permitted to remain, as some were likely to be used by defendant for loading; that defendant's new tracks were constructed in order to store more empty cars; that the additional tracks were a convenience to the railroads since it enabled them to furnish more cars without increasing the frequency of delivery; that the railroads also used defendant's tracks for setting out its inoperable cars, interchanging cars between railroads, and sometimes engines were left by plaintiff in defendant's yard when the crew's time had expired; that defendant conducted its own switching operations within the plant; and that representatives of the ICC and the railroad Demurrage Bureau had checked the demurrage records and took no exception to the method of assessment.

Defendant also attached part of the deposition of plaintiff's super-intendent of stations, who said that from 1956 to 1973 the ICC made inspections but had never objected to plaintiff's method of calculating demurrage; and that in 1973, plaintiff decided that the demurrage charges had been erroneously computed, and it began to calculate demurrage on an "interchange basis," under which an assessment would begin from the time plaintiff placed the car on defendant's interchange track until it was returned there by defendant after loading.

In a supporting memorandum, defendant essentially argued that the facts as disclosed by depositions and affidavits were similar to those in three other cases in which it was held that demurrage should properly have run from the time the car was about to be loaded, rather than at an earlier time (*Southern Ry. Co. v. Aluminum Co. of America* (E. D. Tenn. 1951), 119 F. Supp. 389, *aff'd per curiam* (6th Cir. 1954), 210 F.2d 139; *Pacific Portland Cement Co. v. Western Pacific R.R. Co.* (9th Cir. 1950), 184 F.2d 34, *cert. denied* (1950), 340 U.S. 906, 95 L. Ed. 655, 71 S. Ct. 282; *Chicago & Northwestern Ry. Co. v. Union Packing Co.* D. Neb. 1971), 326 F. Supp. 1304), and that it was therefore entitled to judgment as a matter of law.

Plaintiff, in turn, moved to strike defendant's request for summary judgment on the grounds that (1) there yet existed questions of material

fact; and (2) the arguments in support of defendant's motion were improperly based upon facts which occurred prior to 1968, which was in violation of the previous order in which a request of defendant to admit facts was limited to matters occurring in or after 1968. Plaintiff's reply memorandum had attached an affidavit from R. E. Horner (an officer of plaintiff), stating that plaintiff would occasionally include an unordered car among those it delivered to defendant but that such cars were removed when returned to the interchange track by defendant; that defendant's engines took over all movements of the cars within the plant after plaintiff had delivered them to one of defendant's interchange tracks; that plaintiff did not use defendant's storage tracks for any purpose of its own and did not have access to defendant's tracks for any purpose other than to leave empty cars on the tracks; that because plaintiff always had adequate storage space at its own Gibson yard, there was no advantage to plaintiff in keeping more empty cars at defendant's plant; and that he had no knowledge that anyone from the ICC or Demurrage Bureau ever reviewed the method of assessing demurrage.

After a hearing, defendant's motion for summary judgment was granted, and this appeal followed.

Opinion

Plaintiff contends that material questions of fact exist and that the trial court therefore erred in granting defendant's motion for summary judgment. In this regard, it is clear that summary judgment is proper only if the pleadings and affidavits show that the movant is entitled to judgment as a matter of law. (*Manuel v. McKissack* (1978), 60 Ill. App. 3d 654, 377 N.E.2d 219; *American Buyer's Club v. Zuber* (1978), 57 Ill. App. 3d 899, 373 N.E.2d 786.) However, it is a drastic remedy which should be granted only when the right of the movant thereto is clear and free from doubt (*Marshall v. City of Chicago Heights* (1978), 59 Ill. App. 3d 986, 376 N.E.2d 657; *United Security Insurance Co. v. Mason* (1978), 59 Ill. App. 3d 982, 376 N.E.2d 653), and if a genuine issue as to a material fact exists, summary judgment is improper (*Sielski v. Tioga Homes, Inc.* (1978), 62 Ill. App. 3d 340, 379 N.E.2d 336; *Baier v. State Farm Insurance Co.* (1975), 28 Ill. App. 3d 917, 329 N.E.2d 543, *aff'd* (1977), 66 Ill. 2d 119, 361 N.E.2d 1100).

It should initially be noted that the demurrage charges are governed by Freight Tariff No. 4—I, I.C.C. No. H—36, effective June 1, 1968, and Freight Tariff No. 4—J, I.C.C. No. H—59, effective April 1, 1973 (which replaced Tariff No. 4—I). The relevant portions are phrased identically in both tariffs. Section 1, Rule 3, Item 910, Section E, provides:

"[O]n cars to be delivered on interchange tracks of industrial plants performing the switching services for themselves or other

parties, time [for demurrage charges] will be computed from the first 7:00 a.m. after actual or constructive placement on such interchange tracks until return to the same or another interchange track."

Further, Section 1, Rule 3, Item 910, Section D, states:

" 'Actual Placement' is made when a car is placed in an accessible position for loading or unloading or at a point previously designated by the consignor or consignee."

Defendant's argument in favor of summary judgment here is essentially that while under section E demurrage is assessed from the time the car is actually placed in the interchange tracks (neither party has raised constructive placement as an issue), under section D actual placement is not made until a car is placed in an accessible position for loading or unloading or at a point previously designated by the consignor or consignee; that in the instant case the cars were not in an accessible position for loading until they were brought by defendant to the loading docks; that there was no other point designated by the parties at which actual placement was regarded to have occurred; that demurrage was thus properly computed from the first 7 a.m. after the cars were switched to the loading docks; and that plaintiff's new method of assessing demurrage from the time the car is placed on defendant's lead tracks violates the tariff.

Plaintiff argues that the affidavits and depositions submitted by the parties reveal the existence of some disputed matters. First, there appears to be a question as to whether defendant built new tracks in its plant as a convenience to plaintiff either because it did not have sufficient space to store the cars which were eventually to be delivered to defendant, or because it was unable to make more frequent deliveries. In this regard, Telep said that the new tracks A through E were constructed for the purpose of storing empty cars; and that such cars could not be kept at the railroads' yards because "[t]hey couldn't give us that type of switching." Further, Bowser stated in this affidavit that the new tracks were constructed in order to store more empty cars, which plaintiff could have kept in its own yards had its facilities been closer; and that the additional tracks were a convenience to the railroads since it enabled them to furnish more cars without increasing the frequency of delivery. On the other hand, Horner stated in his affidavit that plaintiff always had adequate storage in its Gibson yard for cars destined for defendant; that defendant benefitted in keeping empty cars at its plant, since it could load more cars daily; and that this was no advantage to plaintiff, as it was still required to make at least one delivery per day.

Second, there is a dispute concerning the extent to which defendant permitted unordered cars to remain on its tracks. Telep stated that

unordered cars were delivered to defendant "[m]any times" and that defendant never requested that they be removed "because we had the room at the time in the yard so it wouldn't be necessary." Further, Bowser stated in his affidavit that while defendant would request that the cars be removed if it had no room, it "generally permitted the railroads to leave these excess, unordered cars on the Plant tracks." On the other hand, Horner stated in his affidavit that "occasionally an unordered car was erroneously included in the cut of cars ordered by [defendant]"; and "that such cars were removed when returned to interchange track by [defendant]."

Third, it is not clear whether there were designated interchange tracks in defendant's plant. Story (in his deposition) and Horner (in his affidavit) made repeated references to defendant's "interchange tracks," and Bowser stated (in his deposition) that defendant had "tracks where the railroads delivered cars to [defendant], so they were interchange tracks." However, Bowser also said that defendant did not give plaintiff particular instructions as to where the empty cars should be parked when delivered and that "[f]or the most part [defendant] left it to [plaintiff's] discretion as long as they followed normal operating procedures where basically they didn't block main switches and their own line of movement."

Fourth, there is an apparent disagreement as to the extent of plaintiff's access to the plant tracks. Bowser stated in his affidavit that the railroads used defendant's tracks for their own convenience in setting out inoperable cars and interchanging cars between railroads; and that they sometimes left their engines on defendant's tracks. However, Horner stated in his affidavit that plaintiff did not use defendant's tracks for any purpose of its own and did not have access to defendant's tracks except for the purpose of leaving cars for loading.

It appears to be defendant's position that any such factual questions are not material and that their existence should not preclude summary judgment. However, in examining the cases upon which defendant relied in support of its motion, both here and in the trial court, we believe that these disputed matters are in fact material.

Defendant first relies on *Southern Ry. Co. v. Aluminum Co. of America* (E.D. Tenn. 1951), 119 F. Supp. 389, *aff'd per curiam* (6th Cir. 1954), 210 F.2d 139. In that case, the Aluminum Company of America (Alcoa) operated a plant which was served by the Southern Railway Company (Southern). Beginning in 1921, Southern delivered all freight cars to be loaded or unloaded at the Alcoa plant and placed them on tracks designated for this purpose. Alcoa performed its own switching by bringing the cars from the tracks where Southern had left them to the loading and unloading areas, but it was evident that the parties intended

that Southern would use the tracks in the Alcoa plant as an assembly and storage yard. During the course of operations, Alcoa informed Southern daily of the empty cars it had on hand and the number that would be required for future use. Further, beginning in 1932, Alcoa furnished Southern with daily reports indicating the dates on which Alcoa moved the cars from the plant yards to the loading area. Alcoa enlarged its plant in 1941 and constructed new tracks to provide more room for sorting and interchanging cars. Throughout this period of time, Southern would occasionally deliver empty cars in excess of the number requested by Alcoa. Most of these cars were left in the plant for future use. Before 1946, Southern did not assess demurrage on the cars until Alcoa removed them from the yards and brought them to the designated points where they were to be loaded or unloaded. In 1946, however, Southern determined, as plaintiff did here, that its interpretation of the applicable tariff since 1921 was erroneous and that demurrage properly should have been assessed beginning from the time the cars were delivered to its yards. Accordingly, Southern brought an action against Alcoa for the resulting increase in charges which had accrued for the 19 immediately previous months.

The controlling provisions of the tariff in *Southern* were identical to those involved in the case at bar. In applying the tariff, the court first noted that there was no definitely established "interchange track." While Southern had written a letter to Alcoa stating that it would place all cars to be delivered "inside the gate at our main line connection with your track at Alcoa" and that it would likewise receive cars at that point, the court viewed this as a convenient informal arrangement which did "not establish an 'interchange track' on which delivery of cars [would] absolutely be accepted or returned." (119 F. Supp. 389, 394.) The court also determined that the cars were not held on Alcoa's orders, stating: "It is true that once each day [Alcoa] informed [Southern] of the number of cars, if any, needed for future loadings. * * * The information given [Southern] in such cases as to the number of cars needed was not an 'order' for cars." 119 F. Supp. 389, 394.

The court, considering it significant that Southern delivered a large amount of unrequested empty cars and that these cars remained in the Alcoa plant for some time until they were needed, stated that:

> "During the month of July 1945, out of three hundred empty cars that were left in the yards by [Southern], eighty were in excess of those ordered by [Alcoa]. * * *
>
>       * * *
>
> [Southern] thus, for the one typical month alone, is seeking by its 'new' interpretation of the tariffs to collect from [Alcoa] $2,971.10 for cars left in the yards without the semblance of a request from

[Alcoa], when there were already in the yards four times as many cars as [Alcoa] needed." (119 F. Supp. 389, 395.)

The court, noting that the Demurrage and Storage Bureau had apparently checked and approved of the demurrage practices and which carried the assumption that the ICC had knowledge of the prior method of computing demurrage, held that demurrage was properly assessed when the cars were moved to the loading docks.

We do not believe, however, that *Southern* supports plaintiff's position in the instant case. First, we note it held that there were no established interchange tracks and, as discussed above, there was deposition testimony that there were such designated interchange tracks. Second, the cars in *Southern* were not formally ordered, as they apparently were in the instant case. Third, *Southern* seems to have relied heavily on the fact that Alcoa allowed numerous unrequested cars to remain in the plant; whereas, in the case at bar, there is a dispute as to whether occasional or many unordered cars were delivered to defendant. We think that these distinctions are material in determining whether, under section D of the tariff, the cars were "placed in an accessible position for loading or unloading or at a point previously designated by the consignor or consignee."

Defendant also relies heavily on *Pacific Portland Cement Co. v. Western Pacific R.R. Co.* (9th Cir. 1950), 184 F.2d 34, *cert. denied* (1950), 340 U.S. 906, 95 L. Ed. 655, 71 S. Ct. 282. In that case, Pacific Portland operated a plant five miles from the tracks and yards of Western Pacific. Pacific Portland owned a private track which connected its plant to Western Pacific's yards, and it also owned and operated the switch engines which would go to the Western Pacific yards, take the empty cars it needed and, after loading them at its plant, would return them to the railroad yards. From 1924 to 1926, Pacific Portland ordered the cars it needed before it went to Western Pacific's yards to remove them and would take only the number it expected to load and return within 6 to 18 hours. In 1926, the railroad asked Pacific Portland to take more cars than were needed in order to help relieve congestion in the railroad yards. Pursuant to this request, Pacific Portland removed empty cars regularly and stored them in its plant until needed for loading. None of the cars removed after 1926 were "ordered" by Pacific Portland, and it is clear that the primary purpose for this arrangement was to benefit Western Pacific. Throughout this time, demurrage was assessed from the time the cars were actually spotted by Pacific Portland for loading. In 1946, however, Western Pacific decided it would begin to compute demurrage from the time Pacific Portland removed the cars from its yard. It recomputed the charges for the prior years and brought an action against Pacific Portland to recover the excess.

The portion of the tariff which controlled such circumstances is identical to Section 1, Rule 6, Item 925, Section D of the tariff involved in the case at bar, and it provides:

> "If an empty car is appropriated without being ordered, it shall be considered as having been ordered and actually placed at the time so appropriated."

In applying that section to the facts before it, the *Pacific Portland* court stated:

> "The reasonable inference to be drawn from the uncontradicted evidence is that both parties regarded the cars stored on [Pacific Portland's] tracks as being held for the benefit of [Western Pacific] and subject to [Western Pacific's] control. The conversations between the station agents and the plant superintendent, the practice of [Western Pacific] in not computing demurrage until the cars were spotted for loading, the letters written by [Western Pacific's] officers after the question was raised by the demurrage bureau, unquestionably sustain such a conclusion." 184 F.2d 34, 38-39.

We do not believe that *Pacific Portland* is supportive of plaintiff's position in the instant case. It concerned the question of whether a car is "appropriated," which apparently is relevant only when the cars are unordered, and it is also unpersuasive even with respect to unordered cars, as the uncontradicted evidence showed that such cars were placed in Pacific Portland's plant for the benefit of the railroad and were subject to the railroad's control. In the instant case, however, as stated above, there is a question as to whether the increased storage area in defendant's plant was intended for plaintiff's benefit, and likewise there is a dispute as to the amount of access and the extent of the control which plaintiff could exercise on defendant's premises.

Finally, defendant relies on *Chicago & Northwestern Ry. Co. v. Union Packing Co.* (D. Neb. 1971), 326 F. Supp. 1304. There, Union operated a plant served by the railroad which employed Omaha Shag, Inc. (Shag), to move its "piggy back" trailers to and from various parking places at Union's plant and to keep Union supplied with trailers. In practice, Shag would place at least one trailer in each of Union's empty docking slots, whether or not Union ordered or then needed it. Shag would also move trailers out of Union's docks after loading. Thus, whenever Union needed to load a car, it would fill one of the waiting trailers delivered by Shag. Union never made direct contact with Shag, nor was Shag under Union's direction and control. While Union acquiesced in the storage of trailers in its loading slots, it did not order or request that this be done. The railroad had always assessed demurrage beginning from the time Union started to load the trailers, but it decided

that demurrage should be computed from the time Shag placed the trailers in the loading slots and, accordingly, brought an action against Union to recover for the resulting increase in previous charges.

The applicable tariff was similar to the one involved in the case at bar, although not identical. It provided that demurrage should be assessed upon actual or constructive placement, and it defined "actual placement" as "the placing of the vehicle at the place designated by the consignor or consignee for loading or unloading." (326 F. Supp. 1304, 1307.) In considering the tariff, the court determined the proper meaning to be given to the term "designated," stating:

> "[T]he term implies that there must be an affirmative act by the shipper revealing not only the place, but also the fact that the vehicle is needed for loading by the shipper. Were it read otherwise, the carrier could, as here attempted, merely place a vehicle at any normal place of loading without any order from the shipper and begin charging demurrage after the free time ran out upon a trailer that the shipper never ordered and, in fact, did not need at all. It surely cannot be the intent of the tariff that the railroad could charge demurrage upon unordered vehicles." (326 F. Supp. 1304, 1307-08.)

The court then held that such "affirmative act" took place when Union began loading the vehicle and that the assessment of demurrage should begin at that time.

We do not feel that *Chicago & Northwestern* supports defendant's position, however, because of its dissimilar facts. First, in that case, the movement of the trailers in the plant was conducted by a firm hired by the railroad; whereas, in the instant case, defendant handled its own switching of cars. Second, the constant and unrequested replenishing of Union's supply of cars was influential in the court's decision; while, in the case at bar, it appears the great majority of the cars were ordered by defendant. Third, the decision turned on the identity of the "designated place"; whereas, in the instant case, it is not clear whether the parties agreed on such a designated point.

Thus, because of the existence of material questions of fact and the inapplicability of the cases relied on by defendant to support summary judgment, we believe that summary judgment should not have been entered.

Plaintiff's second contention is the trial court, in granting defendant's motion, improperly considered matters arising prior to 1968, since the court had previously "entered an Order * * * restricting discovery to 1968 and subsequent." We need not entertain this contention, in the light of our holding above that summary judgment was improper. In any event, we do not feel there was error in this regard. The portion of the order to which plaintiff refers reads as follows:

"[A]ll references to '1951' in Defendant's Request for Admission of Facts are hereby changed to read '1968'."

It is clear that this order merely limited the scope of defendant's request for admission of facts. It did not prohibit the consideration of material matter occurring before that time, nor is there any order in the record which so restricted the taking of depositions or other modes of discovery. We therefore reject plaintiff's argument that the trial court erred in this regard.

For the reasons stated above, the order of the trial court granting defendant's motion for summary judgment is reversed, and this cause is remanded for further proceedings.

Reversed and remanded.

LORENZ and MEJDA, JJ., concur.