INDIANA HARBOR BELT RAILROAD COMPANY, Plaintiff-Appellant, *v.*
THE BUDD COMPANY, Defendant-Appellee.

First District (5th Division)   No. 81—2257

Opinion filed October 29, 1982.

Anna M. Kelly, of Chicago, for appellant.

Vedder, Price, Kaufman & Kammholz, of Chicago (Victor L. Lewis, Allan E. Lapidue, and Richard A. Kaminsky, of counsel), for appellee.

PRESIDING JUSTICE SULLIVAN delivered the opinion of the court:

Plaintiff appeals a judgment against it in an action to collect additional demurrage charges[1] based upon a recomputation of the charges previously made.

Initially, it should be noted that because the facts have been set

---

[1]Monetary charges assessed by a carrier against a shipper for detention of a car held by the shipper for loading or unloading after a period of "free time" allowed by the demurrage tariffs.

forth in a prior appeal in this matter,[2] they will be repeated only insofar as they are pertinent here. In this regard, it appears that since 1950, plaintiff has supplied empty railroad cars needed by defendant for the loading and transportation of its products. Cars assigned for defendant's exclusive use were stored at plaintiff's freight yard six miles from defendant's industrial plant, and plaintiff—upon receiving an order for cars—would deliver them to one of defendant's five interchange tracks located adjacent to its plant where they would remain until defendant's switching crews took them from the interchange tracks and brought them inside its plant for loading. After the cars were loaded, defendant's crews returned them to one of the interchange tracks and released them to plaintiff for delivery to defendant's customers.

Prior to October 1973, the parties had always treated the cars as subject to demurrage from the time defendant placed them in its plant for loading until they were released to plaintiff for delivery, but plaintiff concluded that it had improperly interpreted the tariffs governing demurrage, and it notified defendant that as of October 1973, demurrage would be assessed from the date empty cars were placed on the interchange tracks until they were released under load to plaintiff. Thereafter, all demurrage bills were assessed consistent with the new method of calculation and have been paid by defendant. Plaintiff, however, also issued corrected bills to defendant, pursuant to section 16(3) of the Interstate Commerce Act (49 U.S.C. sec. 16(3) (1976)) (current version at 49 U.S.C.A. secs. 11705, 11706 (1982)), for the period from March 1, 1971, to September 30, 1973, based upon a recomputation under the new method. Defendant, having already paid the charges that were assessed during that period, refused to pay the additional amount.

Plaintiff then brought this action, seeking $425,685[3] from defendant for the additional demurrage charges for the stated period. Defendant counterclaimed for $40,000—the amount of the increase in charges it had paid to plaintiff from October 1973 through the date of the filing of the amended complaint—and it later moved for and was granted summary judgment, which this court reversed and remanded in the prior appeal. The ensuing trial resulted in a finding for defendant on plaintiff's claim for the additional demurrage charges and for plaintiff on defendant's counterclaim. This appeal is brought by plain-

---

[2]*Indiana Harbor Belt R.R. Co. v. Budd Co.* (1980), 87 Ill. App. 3d 91, 408 N.E.2d 944.

[3]Defendant subsequently reduced its claim to $399,280 in an amendment to its second amended complaint.

tiff from the denial of its claim.[4]

OPINION

The sole question presented here is the propriety of the trial court's finding that plaintiff may not recover additional demurrage charges from defendant for the period from March 1, 1971, through September 30, 1973.

Initially, we note that the demurrage tariffs pertinent here include Freight Tariff No. 4—1, I.C.C. No. H—36, effective June 1, 1968, and Freight Tariff No. 4—J, I.C.C. No. H—59, effective April 1, 1973, which replaced and is phrased identically to Tariff No. 4—1, and in Section 1, Rule 3, Item 910 thereof, there are two relevant sections which are set forth as follows:

"SECTION D.—*** on cars to be delivered on other-than-public-delivery tracks, time will be computed from the first 7:00 A.M. after actual *** placement on such tracks.

Time computed from actual placement on cars placed at exactly 7:00 A.M. will begin at the same 7:00 A.M.; actual placement to be determined by the precise time the engine cuts loose. ***

NOTE.—'Actual Placement' is made when a car is placed in an accessible position for loading or unloading or at a point previously designated by the consignor or consignee. ***

SECTION E.—*** on cars to be delivered on interchange tracks of industrial plants performing the switching service for themselves or other parties, time will be computed from the first 7:00 A.M. after actual *** placement on such interchange tracks until return to the same or another interchange track. Time computed from actual placement on cars placed at exactly 7:00 A.M. will begin at the same 7:00 A.M.; actual placement to be determined by the precise time the engine cuts loose."

■ The law conclusively presumes that shippers are aware of lawful tariff rates (*Kansas City Southern Ry. Co. v. Carl* (1913), 227 U.S. 639, 57 L. Ed. 683, 33 S. Ct. 391; *Illinois Central Gulf R.R. Co. v. Tabor Grain Co.* (N.D. Ill. 1980), 488 F. Supp. 110), and where error or misrepresentation of a proper rate is made by a carrier, a shipper may not invoke the doctrine of waiver or estoppel against the right of a carrier to enforce legally applicable rates (*Illinois Central Gulf R.R. Co. v. Tabor Grain Co.; Illinois Central Gulf R.R. Co. v. Golden Trian-

---

[4]Defendant has not appealed the adverse ruling on its counterclaim.

*gle Wholesale Gas Co.* (N.D. Miss. 1976), 423 F. Supp. 679, *aff'd* (5th Cir. 1978), 586 F.2d 588; *Illinois Central Gulf R.R. Co. v. Sankey Brothers, Inc.* (1979), 78 Ill. 2d 56, 398 N.E.2d 3; see generally 13 Am. Jur. 2d *Carriers* sec. 109 (1964)). To hold otherwise would undermine the general purposes of tariffs to promote uniformity and to avoid rate discrimination among shippers. (*Illinois Central Gulf R.R. Co. v. Tabor Grain Co.*) However, where an ambiguous tariff is drafted by the carrier and its construction is in doubt, the tariff should be construed in favor of the shipper since the carrier is presumed to have used language necessary to protect its interest. Further, railroads which drafted tariffs and acquiesced in the shipper's interpretation over a long period of time are deemed to have given the tariff the same interpretation as the shipper. *Illinois Central Gulf R.R. Co. v. Tabor Grain Co.; Norfolk & Western Ry. Co. v. Continental Grain Co.* (E.D. Mo. 1979), 473 F. Supp. 1093, *aff'd* (8th Cir. 1980), 620 F.2d 307; *Kansas City Southern Ry. Co. v. Kansas City Power & Light Co.* (W.D. Mo. 1976), 430 F. Supp. 722, *aff'd* (8th Cir. 1977), 551 F.2d 1134; *Calcium Carbonate Co. v. United States* (S.D. Ill. 1966), 256 F. Supp. 99.

In *Calcium Carbonate Co.*, two railroads submitted revised tariff rates to plaintiffs, who were in the business of selling and shipping ground limestone, contending that the rates collected and charged during the preceding three years were inapplicable and that a higher scale was controlling. The controversy involved a dispute over the meaning of language in the applicable tariff and, in finding for plaintiffs, the court reasoned:

> "We think it highly significant that the intervening railroads for a period of more than three years accepted without question the certification made by plaintiffs and other shippers of ground limestone as being in substantial compliance with Section 4. ***. As the railroads were the progenitors of the tariff and acquiesced in plaintiffs' interpretation for such a long period, we think the inference inescapable that they interpreted it in the same manner. To think otherwise would necessarily attribute to the carriers a degree of indifference, negligence or plain stupidity, for which the record furnishes no justification." 256 F. Supp. 99, 103.

Similarly, in *Tabor Grain Co.*, where the court distinguished between misapplication of a tariff and the interpretation of ambiguous language, the court held:

> "The court finds that defendants are not invoking—nor could they invoke—the doctrine of waiver or estoppel. The ICG now may believe that the tariff was misapplied from 1976 to 1978.

However, the evidence clearly reveals that during that period both the shippers and the carrier interpreted the language in the same way; or at the very least that the carriers willingly acquiesced in, and in fact supported, the shipper's interpretation. Given these findings, plaintiff cannot successfully argue that the tariff was merely misapplied. The procedures followed and the rates applied were the result of a joint agreement by the shippers and the carriers regarding the proper application of Tariffs 604 and 804." 488 F. Supp. 110, 121.

In the instant case, plaintiff has no quarrel with the decisional law holding that ambiguities in tariff provisions will be construed in favor of the shipper, but it maintains that demurrage charges were improperly assessed during the period in question and that no tariff ambiguity exists with respect to sections D and E, which it contends are unrelated and must be read separately. Plaintiff further maintains that demurrage should have been computed during this period under section E, because that section specifically refers to the situation, as here, where cars were "delivered on interchange tracks of industrial plants performing the switching services for themselves" and that, pursuant to this language, demurrage charges began to run from the time cars were placed on defendant's interchange tracks.

It is defendant's position that the definition of actual placement appearing in the "Note" between sections D and E in Rule 3 is controlling of the provisions of both sections, and under that definition, when cars were delivered to the interchange tracks of industrial plants performing switching services themselves, demurrage computations were not to begin until the cars were "placed in an accessible position for loading or unloading or at a point previously designated" by the parties. Defendant reasons that in the instant case, while there is evidence that plaintiff delivered cars to and removed cars from the interchange tracks of defendant, there never was a point designated by the parties for the placement of cars and, in light thereof, defendant concludes that demurrage was properly calculated because actual placement of the cars occurred only when they were "placed in an accessible position for loading."

Thus, the significant question presented is whether the tariff is ambiguous with respect to whether the "Note" definition of actual placement is applicable to section E, and from our examination of the records and briefs filed in this and the prior appeal, it is our view that ambiguity does exist in this regard. This ambiguity is also indicated in the contention of plaintiff that the "Note" definition of actual placement does not apply to section E because that section has its own ex-

clusive definition of the term in its language that "actual placement [is] to be determined by the precise time the engine cuts loose." We note, however, that this exact language is also in section D, and it thus appears to us that it is not a definition but rather was used in both sections solely to ascertain "the first 7:00 A.M." after actual placement on those tracks, which would be determined from the time the engines cut loose from the cars. Thus, if we accepted this contention of plaintiff, that the "Note" definition did not apply to section E, we would also have to find that it did not apply to section D.

Furthermore, we note that section D pertains to cars delivered "on other-than-public-delivery tracks," with demurrage charges to be computed from "the first 7:00 A.M. after actual *** placement" on those tracks. Section E concerns cars delivered "on interchange tracks of industrial plants performing the switching services for themselves" with time to be computed from "the first 7:00 A.M. after actual *** placement" on those tracks. An ambiguity additionally exists in the description of the tracks in that, while each section provides for a different method of demurrage computation, both sections would appear to control the present case. Section D refers to "other-than-public-delivery tracks," and Section 1, Item 20(c) of Tariff 4—1 states that "[f]or the purpose of these rules, a privately owned *** track ***, will constitute an 'other-than-public-delivery' track." It would appear also that each of the interchange tracks here is a private track, which is defined in Section 1, Rule 1, Item 900, of Tariff 4—1 as "a track outside of this railroad's right of way, yard and terminals and of which this railroad does not own either nails, ties, roadbed or right of way."

■ We conclude that the ambiguity found within sections D and E must be construed in defendant's favor. This is particularly true since it clearly appears that the manner in which the demurrage rules were applied was the result of joint agreement between the parties, and both plaintiff and defendant accepted and acquiesced in the interpretation of the ambiguously drafted tariff for a period of 23 years. Defendant was thus entitled to rely on the interpretation given the tariffs by plaintiff for the relevant period prior to October 1, 1973. Accordingly, we hold that the trial court properly found defendant was not liable to plaintiff for the additional demurrage charges sought in its action, and we affirm the judgment appealed from.

Affirmed.

LORENZ and WILSON, JJ., concur.